## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FIBERLIGHT, LLC,<br>11700 Great Oaks Way<br>Suite 100<br>Alpharetta, GA  30022<br><br>      Plaintiff,<br><br>      v.<br><br>THE NATIONAL RAILROAD<br>PASSENGER CORPORATION<br>(d/b/a AMTRAK),<br>60 Massachusetts Ave., N.E.<br>Washington, DC  20002<br><br>      Defendant,<br><br>      and<br><br>TW TELECOM OF D.C. LLC<br>10475 Park Meadows Dr.<br>Littleton, CO  80124<br><br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.: _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

**COMES NOW**, FiberLight, LLC, ("FiberLight" or "Plaintiff"), by its undersigned counsel, and brings this Complaint against the National Railroad Passenger Corporation (doing business as Amtrak) ("Amtrak"), and tw telecom of D.C. LLC ("TWTC") (together, FiberLight, TWTC, and Amtrak are referred to as the "Parties"), and in support thereof, states as follows:

## PARTIES

1.     Plaintiff FiberLight, LLC is a Delaware limited liability company with its principal place of business at 11700 Great Oaks Way, Suite 100, Alpharetta, GA 30022.

FiberLight constructs fiber optic networks for sale or lease to other providers, on both a retail and wholesale basis.  FiberLight is a provider of retail and wholesale Ethernet, Wavelengths, IP, SONET, and Dark Fiber optical transport, as well as strategic network design services.  The instant dispute relates to a fiber optic communications network and related facilities that FiberLight owns and operates in the District of Columbia (the "District").

2.      Defendant the National Railroad Passenger Corporation, doing business as Amtrak, is a Washington, D.C. corporation with its principal place of business at 60 Massachusetts Ave., N.E., Washington, DC  20002.  Amtrak is a publicly funded railroad service operated and managed as a for-profit corporation that provides intercity passenger train service in the United States.  Amtrak manages the property in and around Union Station in the District of Columbia and Amtrak's rights to license or lease that property located in the District are at the center of this controversy.

3.      Defendant tw telecom of D.C. LLC ("TWTC") is a Delaware limited liability company with its principal place of business at 10475 Park Meadows Dr., Littleton, CO 80124. TWTC is a competitive local exchange carrier ("CLEC") providing Ethernet and other telecommunications services to business customers.  TWTC owns and operates fiber optic networks and sold, on or about May 9, 2005, to FiberLight the fiber optic network in the District that is at the source of this controversy.

## JURISDICTION AND VENUE

4.      This is a suit, *inter alia*, for declaratory judgment pursuant to the Federal Declaratory Judgment Act.  28 U.S.C. § 2201, *et seq.*

5.      This Court has jurisdiction to hear this matter under 28 U.S.C. §§ 1331 and 1349. Any suit involving a federally chartered railroad raises a federal question under § 1331.  *Union*

*Pac. R.R. Co. v. Myers*, 115 U.S. 1, 11 (1885).  Section 1349 further provides:  "The district

courts shall not have jurisdiction of any civil action by or against any corporation upon the

ground that it was incorporated by or under an Act of Congress, unless the United States is the

owner of more than one-half of its capital stock."  28 U.S.C. § 1349.  Amtrak was created by act

of Congress, and the United States government owns more than 50 percent of Amtrak's stock.

*Pa. Fed'n of Bhd. of Maint. of Way Emps v. Nat'l R.R. Passenger Corp.*, 989 F.2d 112, 113, n.2

(3d Cir. 1993).  Thus, this Court has subject matter jurisdiction to hear this matter pursuant to 28

U.S.C. §§ 1331 and 1349.

6.      This Court has supplemental jurisdiction to hear the claims against Defendant

TWTC because these claims are substantially related to the claims against Amtrak and form part

of the same case or controversy.  28 U.S.C. § 1367(a).

7.      This Court has personal jurisdiction over Defendants.  TWTC has regularly

transacted and conducted business in the District and Amtrak claims to own and/or manage

property in the District, and has its principal place of business in the District.

8.      Venue is proper in the District pursuant to 28 U.S.C. § 1391(b) and (c) because a

substantial part of the acts and omissions giving rise to Plaintiff's claims occurred and are

occurring in the District.

## BACKGROUND

9.      This is a suit pursuant to the Federal Declaratory Judgment Act to declare the

rights and obligations of the Parties, including but not limited to their rights and obligations

pursuant to a contract.  28 U.S.C. § 2201, *et seq.*  This declaratory judgment action requests that

the Court declare the rights and obligations of the three Parties—FiberLight, TWTC, and

Amtrak—in connection with Amtrak's right to license, for a significant annual fee, the use of certain property in and around Union Station in Washington, DC.

10.     This is also a suit by Plaintiff FiberLight against Amtrak, in connection with the same controversy, to declare certain provisions of an Amtrak contract with TWTC giving TWTC access to certain rights-of-way in and around Union Station, and which TWTC and FiberLight intend to have assigned from TWTC to FiberLight, void *ab initio* because the contract is: a) contrary to public policy, and b) based upon mutual mistake of fact or, in the alternative, based upon fraud.

### Dispute Over Amtrak's Authority To Assess Fees Under The ROW Agreement

11.     On March 1, 1999, ACSI Network Technologies and e.spire Communications, Inc.,[1] entered into a Railroad Right-of-Way License Agreement with Amtrak, effective March 1, 1999 ("ROW Agreement").  The ROW Agreement was in effect for an initial term of five years and may be renewed at the licensee's option for five additional five-year terms.  Upon information and belief, the ROW Agreement has been renewed twice since its inception and is currently in effect through March 1, 2014.  TWTC purports to be the successor to ACSI Network Technologies and e.spire Communications, Inc. with respect to the ROW Agreement.[2]  The ROW Agreement includes, *inter alia*, the licensing of property which Amtrak claims to own in and around Union Station, including but not limited to license payments for four sections of "raw land around Union Station" demarcated in the ROW Agreement ("Union Station Property").  ROW Agreement, at Preamble, ¶ A; ¶ 2.1.1.  The license payments for this land increase over

---

[1] ACSI Network Technologies and e.spire Communications, Inc. were  jointly and severally liable under the ROW Agreement.

[2] An amendment to the ROW Agreement dated August 30, 2002,  notes the bankruptcy of ACSI Network Technologies and  e.spire Communications and the acquisition of certain assets by Xspedius Management Company, LLC, which the amendment describes as the successor to e.spire Communications, Inc. and ACSI Network Technologies under the ROW Agreement.  TWTC has represented itself as a successor to Xspedius Management Company, LLC by way of an acquisition made in 2006.

time and represent significant annual fees.  In an amendment to the ROW Agreement made as of

August 30, 2002, the annual license fee was stated as $62,164.  Pursuant to the ROW

Agreement, "the Annual License Fee shall be increased (but in no event decreased) to reflect the

increase in the CPI during the immediately preceding Contract Year."  ROW Agreement, ¶ 3.3.

The most recent Amtrak invoice to TWTC dated March 18, 2013 was for $79,578.25.

       12.      On April 22, 2005, NT Assets LLC[3] and FiberLight entered into an Asset

Purchase Agreement to sell NT Assets LLC to FiberLight, including its fiber optic network in the

District.  A portion of that network is buried under the Union Station Property that is the subject

of the ROW Agreement.  FiberLight builds fiber optic networks across the country, and has

established a billion dollar diversely constructed optical ring topology network.  FiberLight has

been certificated as a facilities-based telecommunications provider in the District of Columbia

since September 16, 2005.  *Application of FiberLight, LLC to Provide Local*

*Telecommunications Services in the District of Columbia*, Formal Case No. TA 05-9, Order No.

13761 (Sept. 16, 2005).  The D.C. Public Service Commission found that FiberLight "has

demonstrated that it has the experience and financial resources to provide telecommunications

services in the District ...."  *Id.* at 3.  FiberLight takes responsibility for the turnkey operation of

its state-of-the-art fiber optic networks and operates safe and reliable networks nationwide.

       13.      The closing pursuant to the Asset Purchase Agreement took place on or about

May 9, 2005 and, as of the date of the closing, FiberLight took ownership of virtually all of

TWTC's fiber optic network under and around the Union Station Property, including all related

facilities, ducts, conduit, and ancillary equipment.  There was a small segment of fiber in the area

that TWTC retained and was not subject to the Asset Purchase Agreement.

---

[3] NT Assets LLC is also a predecessor of TWTC.

14.     Pursuant to the parties' Asset Purchase Agreement, the parties agreed that TWTC would assign the ROW Agreement to FiberLight, but that this was one of a series of agreements where such assignment could not be completed without the consent a third party, in this case the consent of Amtrak.

15.     A number of issues delayed the execution of an assignment agreement assigning the ROW Agreement from tw telecom to FiberLight.  The most significant such issue was FiberLight's relatively recent discovery in May 2013 that Amtrak does not appear to have a right to license the Union Station Property for a fee, and Amtrak's refusal to provide documentation of its billable interest in such property. (As used herein, "billable interest" refers to an interest in the property, considering all the circumstances, including dedication to the public use, that would give Amtrak a right to charge fees to lease the property to third parties.)

16.     Prior to this year, there were a series of additional issues between the parties that made it impossible to complete the assignment of the ROW Agreement.

17.     For example, on September 26, 2006, FiberLight provided a draft license to Amtrak for review.  FiberLight proposed to pay a license fee, but only in an amount corresponding to the length of FiberLight's fiber in the area, and excluding the amount corresponding to the remaining TWTC fiber.

18.     Amtrak provided an initial mark up of the draft on July 16, 2007 and said that it would also be necessary to simultaneously amend the ROW Agreement with TWTC such that TWTC would continue to pay ROW fees associated with its fiber.  Amtrak estimated that the total fee would be $71,132.22, pursuant to the ROW Agreement and CPI increases.

19.     Delays ensued when it became clear the Parties could not apportion that fee amount between TWTC and FiberLight without first gaining access to the fiber route and doing a

walk-through of the actual fiber to determine what exact portions were owned by FiberLight and TWTC.

20.     FiberLight also raised a separate issue with TWTC.  FiberLight had made payments worth approximately $22,000 on TWTC's behalf in connection with certain TWTC network in Jacksonville, Florida.  Because FiberLight had faced challenges in collecting this amount from TWTC, FiberLight requested of TWTC that the two issues be resolved at the same time.  This led to further delays.

21.     In order to establish the extent of the fiber ownership retained by TWTC, the parties requested a walk-through of the premises.  After some time, the parties were able to conduct a series of walk-throughs.  Based upon a request initially made in 2010, TWTC and FiberLight conducted a walk-through on or about January 25, 2011.  Based upon additional review of the facilities since that time, TWTC ultimately agreed to remove the tags from certain facilities which had indicated TWTC's ownership of those facilities.  TWTC and FiberLight also agreed that they would execute a bill of sale to reflect the sale of these discrete, additional facilities, which in the end represented a very limited span of network.

22.     TWTC has represented to FiberLight that, throughout this time period, TWTC continued to make payments to Amtrak under the ROW Agreement.  TWTC has had direct access to the rights-of-way in question.  FiberLight has not had direct access to these rights-of-way and, at Amtrak's insistence, FiberLight has only had access during the walk-throughs by coordinating with TWTC, as a "contractor" for TWTC.

23.     With the walkthroughs completed, the parties began again to negotiate the assignment of the ROW Agreement in early 2013.  However, on or about May 10, 2013, FiberLight became aware, through detailed research of Union Station land records and other

research, that the land Amtrak purports to own and license in the ROW Agreement:  a) may not

be owned by Amtrak; and/or b) has been dedicated to the public use since 1914, pursuant to

Interstate Commerce Commission Valuation Order No. 7.  ICC Valuation Order No. 7 (Nov. 21,

1914) ("Valuation Order No. 7").  The records of the Baltimore and Ohio Railroad Company

under Valuation Section 19.1, Map Numbers 1 to 3, lists all of their tracks at Union Station as

dedicated to public use pursuant to Valuation Order No. 7.  On information and belief, this

property dedicated to the public use is the same property that Amtrak has leased to TWTC for a

fee pursuant to the ROW Agreement.  Once land has been dedicated to the public use, it is no

longer lawful for Amtrak or any other entity to charge fees for access to such land.  *See, e.g.*,

*Payne, et al. v. Godwin*, 147 Va. 1019, 1025, 133 S.E. 481, 483 (Va. 1926).

        24.     In light of this new information, FiberLight, by letter dated May 14, 2013,

requested that Amtrak provide proof of its ownership interest in the property in question, and

also asked what authority Amtrak had to charge a fee for access to such property in light of the

fact that it has been dedicated to public use.  Amtrak, by letter dated May 17, 2013, refused to

provide any information to FiberLight relating to its billable interest in the Union Station

property.  In fact, Amtrak refused to discuss the matter with FiberLight at all, responding:

"Amtrak has no contract with FiberLight; owes no obligations to FiberLight and hence, need not

make any representations to FiberLight."

        25.     FiberLight, in a further effort to resolve this issue amicably with Amtrak,

responded on June 5, 2013 by indicating that, given current information, FiberLight could not

accept assignment of the ROW Agreement from TWTC absent some proof of Amtrak's

ownership interest in and right to charge fees for a license to run network under the Union

Station Property.  FiberLight also offered to enter into a new license agreement, separate and apart from the ROW Agreement, that would better reflect Amtrak's interest in the property.

26.      By letter dated June 20, 2013, Amtrak again refused to provide any information relating to its billable interest in the Union Station Property.  Amtrak also refused to negotiate an alternative license arrangement with FiberLight, either by amending the ROW Agreement or by entering into a new agreement reflecting Amtrak's ownership interest, if any, in the Union Station Property.  FiberLight even requested a reduction in the lease payments, which is explicitly permitted under the ROW Agreement (Section 14.6(b)), but Amtrak refused to produce any information or negotiate a reduced payment under the terms of the ROW Agreement or otherwise.

27.       By letter dated June 28, 2013, FiberLight again requested information relating to Amtrak's interest and requested a face-to-face meeting with Amtrak. TWTC had also expressed an interest in resolving the matter by way of a conference call between the three parties.

28.      Amtrak initially agreed to a conference call with FiberLight only, by e-mail dated July 10, 2013, to take place during the week of July 15.  By e-mail dated July 15, Amtrak deferred the call and, on July 22, 2013, sent a letter stating that it would not participate in a call until FiberLight produced additional documents, including information concerning FiberLight's "financial and technical qualifications."

29.      In the same July 22 letter, Amtrak stated that it "owes no obligations to FiberLight and need not make any representations to it . . . ."  Amtrak went on to state that "Amtrak is gathering information about its interests in the property around Union Station solely for the purposes of furthering Amtrak's ongoing efforts to complete this matter."  The letter

contained no information concerning Amtrak's ownership interest in the property and/or whether the property, even if owned by Amtrak, had nonetheless been dedicated to the public use.

30.     In the same letter, Amtrak stated that it "does not intend to make further proposals" to FiberLight until FiberLight marked up the latest assignment agreement provided by Amtrak earlier in the year.  Amtrak threatened to remove FiberLight's installations, unless they were installed pursuant to the ROW Agreement, in which case "the installations are to be maintained and operated by TWTC in accordance with" the ROW Agreement.

31.     FiberLight submits that Amtrak does not have authority to assess license fees or fees of any kind upon third parties for the use of these rights-of-way.  Amtrak has not demonstrated that it owns the property in question and, even if it does, the land has been dedicated to the public use and, as such, Amtrak cannot charge fees to TWTC or FiberLight for the licensing, lease, or other use of such land.

### Demand By TWTC Upon FiberLight For Reimbursement
### Pursuant To The ROW Agreement

32.     Upon information and belief, during the period from May 9, 2005, the closing date of the Asset Purchase Agreement, to the present, TWTC has continued to make payments to Amtrak pursuant to the ROW Agreement.

33.     Upon information and belief, Amtrak has issued invoices to TWTC for payments to be made pursuant to the ROW Agreement.  Upon information and belief, TWTC has paid such invoices, in whole or in part, as payments that TWTC believed to be due Amtrak pursuant to the ROW Agreement.

34.     At no time during the relevant period did TWTC and FiberLight execute an assignment of the ROW Agreement from TWTC to FiberLight.  As such, TWTC is a party to the ROW Agreement with Amtrak and FiberLight is not a party to such Agreement.

35.     TWTC has never claimed that FiberLight is currently a party to the ROW Agreement.  As recently as June 5, 2013, TWTC agreed in a letter to FiberLight that FiberLight is not a party to the ROW Agreement and specifically denied to FiberLight any of the benefits of the ROW Agreement:  "FBL [FiberLight] has yet to provide any substantiation that FBL has any right to use and/or access the facilities under the Amtrak License Agreement [ROW Agreement] or that TWTC has an obligation to provide access to FBL."

36.     Nonetheless, TWTC has at various times demanded that FiberLight reimburse TWTC for the fees TWTC has paid to Amtrak pursuant to the ROW Agreement, despite the fact that the ROW Agreement has not been assigned, FiberLight is not a party to the ROW Agreement, and both TWTC and Amtrak deny FiberLight the benefits of such Agreement.

37.     Most recently, in a letter dated June 5, 2013, TWTC stated its demand for payment by FBL of the fees and charges TWTC has paid to Amtrak pursuant to the ROW Agreement in the amount of $540,826.73 "for FBL's use of the facilities under the Amtrak License Agreement."  June 5 Letter at 2.  Prior to that date, TWTC has made similar demands upon FiberLight for reimbursement of TWTC's payment of fees pursuant to the ROW Agreement.

38.     Although FiberLight owns and uses the network facilities which it acquired pursuant to the Asset Purchase Agreement, it has never obtained access to such facilities pursuant to the ROW Agreement except through TWTC.

39.     At no time has TWTC consulted with FiberLight prior to making payments under the ROW Agreement.  FiberLight has never received an invoice from Amtrak for payment of any fees pursuant to the ROW Agreement, had no discretion in determining the amount or timing of payments, and has never made any payments directly to Amtrak pursuant to the ROW Agreement.

40.     FiberLight has received from TWTC a copy of an invoice issued by Amtrak to TWTC.  This Amtrak invoice was dated March 18, 2013 and was for $79,578.25, reflecting a further increase in the fees to almost $80,000.  Upon information and belief, TWTC recently paid Amtrak this amount and, upon information and belief, at a time after TWTC had been advised by FiberLight that FiberLight had discovered that Amtrak does not appear to have any authority to charge fees for access to the Union Station rights of way in question.  Again, TWTC did not consult with FiberLight before making such payments, and continued to make payments to Amtrak after it was aware that Amtrak may not have a right to charge any fees.

41.     FiberLight can no longer continue on its current course without a near-term, final resolution of Amtrak's ownership rights in the Union Station Property.  Amtrak will not cooperate by providing its proof of ownership and proof of authority to charge fees for access to the property.  FiberLight cannot execute an assignment agreement assigning the ROW Agreement from TWTC to FiberLight without first understanding what Amtrak's billable interest is in the property.  If FiberLight executes an assignment agreement, it could be interpreted to have agreed to the terms of the ROW Agreement, when Amtrak does not appear to have authority to charge the significant fees contained therein.  Furthermore, TWTC has demanded payment of $540,826.73 prior to executing such an assignment.  FiberLight is not willing to make such payment or pay any amount of compensation in connection with the ROW

Agreement, particularly before it understands what rights Amtrak has or ever had to charge these fees.

42.    By letter dated June 26, 2013, TWTC has demanded payment and execution of an assignment agreement by July 31, 2013.  In the same letter, TWTC has threatened, absent such payment and execution, to explore "other options for the use of" FiberLight's facilities (to which FiberLight has duly objected).  In its June 26 letter, TWTC also demanded that FiberLight remove, at FiberLight's expense, "all fiber located in the conduits covered under the" ROW Agreement.  The fiber in question is carrying live telecommunications traffic for private and government customers and cannot be disturbed without substantial loss to Fiberlight, its customers, and the general public that these customers serve.

43.    Amtrak in turn, by letter dated June 20, 2013, has also demanded the removal of FiberLight's fiber, stating that, "Amtrak has no record of FiberLight having any such occupancy rights."   Amtrak stated that, without an executed ROW Agreement, FiberLight must remove its fiber.  By letter dated July 22, 2013, Amtrak again threatened to remove FiberLight's installations, unless they were installed pursuant to the ROW Agreement, in which case "the installations are to be maintained and operated by TWTC in accordance with" the ROW Agreement.

44.    Although Amtrak claimed in its July 22 letter to be "gathering information about its interests in the property around Union Station," FiberLight would expect such information to be readily available given Amtrak's longstanding practice of leasing its "raw land" to third parties.  FiberLight cannot continue to negotiate an assignment agreement until it understands whether Amtrak has a right to lease the land for which it charges annual fees of $70,000 or more, information that Amtrak has been unwilling to provide.  By letter dated June 5, 2013, FiberLight

requested confirmation that TWTC would provide access to the fiber in question, if needed.  In the same letter, TWTC would not confirm that it has an obligation to provide access to FiberLight and stated that "TWTC will not be responsible or liable in any manner for FBL's inability to access the property . . . ."

45.    In order to move forward with its business, ensure access to its own fiber, and to determine the rights of Amtrak, FiberLight, and TWTC, FiberLight needs an immediate and final clarification of Amtrak's right to charge fees for access to the Union Station Property.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment pursuant to 28 U.S.C. § 2201 *et seq.*)

46.    FiberLight repeats and realleges each and every allegation contained in paragraphs 1 to 45 of this Complaint as if fully set forth herein.

47.    There is currently uncertainty between FiberLight, Amtrak, and TWTC due to a need to determine:  a) Amtrak's billable interest in the ROW Agreement; b) whether certain portions of the ROW Agreement are void *ab initio*; and c) the relationship between FiberLight, Amtrak, and TWTC in relation to the Union Station Property.

48.    An actual and immediate controversy exists because Amtrak has refused to identify its ownership and billable interest in the Union Station Property, and has refused to provide FiberLight with direct access to the Union Station Property, other than by requiring that FiberLight accept the assignment of the ROW Agreement, including the unlawful payment provisions.

49.    An actual and immediate controversy exists because Amtrak has threatened to remove FiberLight's fiber and related facilities from the Union Station Property if FiberLight will not agree to accept the assignment of the ROW Agreement.

50.     FiberLight faces an actual and immediate controversy because TWTC has refused to assign the ROW Agreement to FiberLight unless FiberLight first makes a payment of $540,826.73, the basis of which FiberLight has challenged as described herein.

51.     There is an actual and immediate controversy because TWTC has threatened, over FiberLight's objection, to use FiberLight's facilities for other purposes, unless FiberLight accepts assignment of the ROW Agreement and makes payment of $540,826.73.

52.     FiberLight faces an actual and immediate controversy because TWTC has stated that it will not provide FiberLight with immediate access as needed to FiberLight's fiber and related facilities under the Union Station Property, which carry live telecommunications traffic for government and private customers.

53.     There is an actual and immediate controversy because FiberLight cannot continue to bear the risk of disruption of its facilities, either by way of Amtrak threatening to remove them, or by TWTC refusing to provide access to them or commandeer them.  A declaration by this Court defining Fiberlight's relationship with Amtrak and TWTC will resolve the matter.

54.     Section 14.9 of the ROW Agreement provides that if any "one or more of the provisions contained in this Agreement is held invalid, illegal or unenforceable," the enforceability of any other provision shall not be impaired, "unless the provisions held invalid, illegal or unenforceable shall substantially impair the benefits of the remaining provisions hereof."  ROW Agreement, § 14.9.  Fiberlight submits that the payment provisions of the ROW Agreement are invalid, illegal and unenforceable, given that Amtrak does not have a billable interest in the real property it purports to license. FiberLight requires that the remainder of the ROW Agreement remain intact pursuant to section 14.9 so that it can accept assignment of the ROW Agreement from TWTC and have a means to access its fiber optic network going forward.

If the ROW Agreement were declared void in its entirety, Amtrak would likely insist on the removal of FiberLight's fiber optic network, resulting in serious disruption to the detriment of FiberLight's business.

55.     An immediate determination of this controversy will relieve the Parties from the uncertainty and insecurity that now exists.  Specifically, FiberLight requests a determination: a) that Amtrak does not have a right to charge fees for access to the Union Station Property; b) that any and all payment provisions of the ROW Agreement entitling Amtrak to charge any fee for the Union Station Property, and related financial provisions (including but not limited to Section 3.2 and any amendments thereto) ("Payment Provisions") of the ROW Agreement are void *ab initio*; c) that pursuant to Section 14.9, the remainder of the Agreement shall  remain in effect; and d) that FiberLight does not owe any payment to either TWTC or Amtrak based upon the ROW Agreement.

## SECOND CLAIM FOR RELIEF

### (ROW Agreement Void as a Matter of Public Policy)

56.     FiberLight repeats and realleges each and every allegation contained in paragraphs 1 to 55 of this Complaint as if fully set forth herein.

57.     The Union Station Property has been dedicated to the public use since 1914, pursuant to Valuation Order No. 7.  ICC Valuation Order No. 7 (Nov. 21, 1914).  The records of the Baltimore and Ohio Railroad Company under Valuation Section 19.1, Map Numbers 1 to 3, lists all of their tracks at Union Station as dedicated to public use pursuant to Valuation Order No. 7.  On information and belief, this property dedicated to the public use is the same property as the Union Station Property that Amtrak has leased to TWTC for a fee pursuant to the ROW Agreement.

58.      It is well-established at common law by a uniform line of decisions that where streets, alleys, and other rights-of-way are dedicated to the public without reservation, the effect thereof is to vest in the state for the entire public an easement in the land so dedicated, and to deprive others of any property interests in such property.  *See, e.g.*, *Payne, et al. v. Godwin*, 147 Va. at 1025.

59.      The ROW Agreement, by which Amtrak has held itself out as the owner of the "raw land around Union Station" (the Union Station Property), and whereby Amtrak entered into a private lease for private corporate gain for land that has been dedicated to the public interest, is contrary to the public interest. The Payment Provisions of the ROW Agreement should be declared by this Court to be void *ab initio*.

60.      Where courts have found that contracts are "patently offensive to the public good," they have found such contracts to be void.  *See, e.g., Estate of Woods, Weeks & Co.*, 52 Md. 520, 536 (1879).

61.      Amtrak has held itself out in the ROW Agreement as the owner of the "raw land around Union Station," and has tried to reclaim by way of contract property that has been dedicated to the public use for a century.  Amtrak has profited in an amount that, upon information and belief, exceeds $500,000 from TWTC alone over only a few years.

62.      FiberLight requests that this Court declare the Payment Provisions of the ROW Agreement to be void *ab initio* as a matter of public policy, and declare that any claims based upon such Payment Provisions of the ROW Agreement, including but not limited to TWTC's claims against FiberLight, are null and void.  FiberLight further requests that the remainder of the ROW Agreement remain intact so that FiberLight can accept the assignment of such Agreement and carry on with its business without renewed disruption.

17

## THIRD CLAIM FOR RELIEF

### (Mutual Mistake of Fact)

63.     FiberLight repeats and realleges each and every allegation contained in paragraphs 1 to 62 of this Complaint as if fully set forth herein.

64.     In the ROW Agreement, Amtrak holds itself out as the owner of the "raw land" comprising the Union Station Property, with the authority to charge fees for the use of the Union Station Property.

65.     Upon information and belief, TWTC's predecessors entered into the ROW Agreement unaware that Amtrak did not have the ownership and/or other rights necessary for it to assess charges for use of the Union Station Property.  Upon information and belief, TWTC made payments to Amtrak estimated at $540,826.73 since May 2005.  TWTC, a profit-maximizing entity, would not have made such significant payments had they known Amtrak was not legally entitled to assess such fees.

66.     The ROW Agreement states that Amtrak as Licensor "based on Licensor's best current understanding, believes it holds sufficient legal title and is otherwise in a position" to license the Union Station Property.  ROW Agreement, § 14.6(b).  Amtrak also was mistaken as to the fundamental underlying fact that it did not have an interest in the Union Station Property that would permit it to charge a fee to lease such property.  The payment of these significant license fees were a central part of the ROW Agreement.

67.     Where both parties to a contract entertained a material mistake of fact that went to the heart of the bargain, the contract may be rescinded.  *Bituminus Coal Operators' Ass'n Inc. v. Connors*, 276 U.S. App. D.C. 9, 19, 867 F.2d 625, 635 (1989).  A mutual mistake occurs when

both parties are under substantially the same erroneous belief as to the facts." *See generally* E. Allan Farnsworth, 2 Farnsworth on Contracts, § 9.3, at 508 (1990).

68.     FiberLight requests that this Court declare the Payment Provisions of the ROW Agreement to be void *ab initio,* based upon a mutual mistake of fact, and declare that any claims based upon such Payment Provisions of the ROW Agreement, including but not limited to TWTC's claims against FiberLight, are null and void.  FiberLight further requests that the remainder of the ROW Agreement remain intact so that FiberLight can accept the assignment of such Agreement and carry on with its business without further disruption.

## FOURTH CLAIM FOR RELIEF

### (Fraud in the Inducement by Amtrak)

69.     FiberLight repeats and realleges each and every allegation contained in paragraphs 1 to 68 of this Complaint as if fully set forth herein.

70.     When it entered into the ROW Agreement, Amtrak either did not know that it did not have a billable ownership interest in the Union Station Property, which is an element of a mutual mistake of fact claim, or it did know that it did not have a billable ownership interest in the Union Station Property, which is an element of a fraud claim.

71.     This Fourth Claim for Relief is pled in the alternative to the Third Claim alleging mutual mistake of fact.

72.     On April 12, 1999, when Amtrak Vice President Sally J. Bellet executed the ROW Agreement, there is evidence that Amtrak knew that it did not have a conveyable ownership and/or billable interest in the Union Station Property, given that Amtrak's ROW Agreement specifically states:  "it is possible, however, that Licensor may not be able to license certain portions" of the Union Stations Property.  ROW Agreement, § 14.6(b).  In the same

ROW Agreement, however, Amtrak also explicitly and repeatedly holds itself out as the owner

of the "raw land" that comprises the Union Station Property with the right to charge significant

license fees in Section 3.1 for the license to use the Union Station Property described, *inter alia*,

at Section 2.1.  Amtrak has corporate knowledge of its ownership and other billable interest in

the Union Station Property and any other property for which it charges license fees.  Amtrak also

retains records of the property it owns and has access to both public and private records

indicating whether property it licenses to third parties such as TWTC and FiberLight has been

dedicated to public use.

73.     Amtrak's continued conduct demonstrates that it knows that it does not have

billable interests in the Union Station Property.  When FiberLight requested by letter dated May

14, 2013 to Vincent R. Brotski, Esq., Amtrak Associate General Counsel, that Amtrak provide

proof of ownership and its billable interest in the Union Station Property, Amtrak refused, by

letter from Vincent R. Brotski dated May 17, 2013, to provide any such proof of ownership.

Upon a further request by FiberLight by letter to Vincent R. Brotski dated June 28, 2013,

Amtrak, by letter from Vincent R. Brotski dated July 22, 2013, again refused to provide such

proof of ownership or billable interest but said that it was "gathering information about its

interests in the property around Union Station . . . ."  As such, Amtrak, despite these repeated

requests  has also not been able to refute FiberLight's claim that the Union Station Property has

been dedicated to public use.

74.     FiberLight received a report from its consultant Eagle 1 Resources, LLC, on or

about May 10, 2013, evidencing that, based upon their detailed research of Union Station land

records in College Park, Maryland, the land Amtrak purports to own and license in the ROW

Agreement:  a) may not be owned by Amtrak; and/or b) has been dedicated to the public use

since 1914, pursuant to Interstate Commerce Commission Valuation Order No. 7.  ICC

Valuation Order No. 7 (Nov. 21, 1914).  The records of the Baltimore and Ohio Railroad

Company under Valuation Section 19.1, Map Numbers 1 to 3, lists all of their tracks at Union

Station as dedicated to public use pursuant to Valuation Order No. 7.  This property dedicated to

the public use is precisely the same property that Amtrak has leased to TWTC for a fee pursuant

to the ROW Agreement.  Once land has been dedicated to the public use, it is no longer lawful

for Amtrak or any other entity to charge fees for access to such land.  *See, e.g.*, *Payne, et al. v.

Godwin*, 147 Va. 1019 at 1025.  As evidenced by Section 14.6 of the ROW Agreement itself,

Amtrak appears to have known that it did not have a billable ownership interest in the Union

Station Property and has falsely represented to both TWTC and to FiberLight that it did have

such a billable interest in the "raw land" that comprises the Union Station Property sufficient to

assess the Section 3.1 license fees for the use of such property.  Such billable interest is a

material fact in relation to the ROW Agreement, pursuant to which Amtrak is believed to have

invoiced over $540,826.73 in charges to at least one company, TWTC, during one eight-year

period from 2005 to 2013.

75.      Amtrak's concealment of the fact that it did not have a right to bill for the Union

Station Property was made with an intent to deceive TWTC and FiberLight.  TWTC made

payments to Amtrak from on or about 2005 to early 2013 in reliance on those representations and

FiberLight began to negotiate the assignment of the ROW Agreement, *inter alia*, until on or

about May 10, 2013 based upon such representations.  Under the circumstances, TWTC's and

FiberLight's reliance upon Amtrak's written, contractual representations of ownership and a

billable interest in the "raw land" was reasonable.

76.     FiberLight requests that this Court declare that Amtrak engaged in fraud in the inducement of the ROW Agreement.  FiberLight further requests that this Court declare the Payment Provisions of the ROW Agreement to be void *ab initio* as based upon fraudulent inducement by Amtrak, and declare that any claims based upon such Payment Provisions of the ROW Agreement, including but not limited to TWTC's claims against FiberLight, are null and void.  FiberLight further requests that the remainder of the ROW Agreement remain intact so that FiberLight can accept the assignment of such Agreement and carry on with its business without further disruption.

77.     FiberLight's business has been significantly disrupted by Amtrak's effort to extract payments for the Union Station Property, including but not limited to:  a) the uncertainty and expense associated with FiberLight's inability to gain assurances of access to its own network, as described in the letters quoted herein; 2) the uncertainty caused by the Parties' inability to conclude after 8 years what should have been a routine assignment of the ROW Agreement; and 3) the cost and opportunity cost of attempting to resolve this dispute and having to pursue this litigation to do so.

78.     FiberLight seeks punitive damages and attorneys' fees in relation to Amtrak's fraudulent inducement of the ROW Agreement.

## **FIFTH CLAIM FOR RELIEF**

### **(Reformation of the ROW Agreement)**

79.     FiberLight repeats and realleges each and every allegation contained in paragraphs 1 to 78 of this Complaint as if fully set forth herein.

80.     If  this Court renders a Declaratory Judgment, or finds as a matter of public policy, that the Payment Provisions of the ROW Agreement are void *ab initio*, this Court has authority to reform the contract to eliminate the Payment Provisions.

81.     Where there has been a mutual mistake of fact, or mistake on one side and fraud or inequitable conduct on the other, this Court also has jurisdiction in equity to reform the ROW Agreement.  *See, e.g.*, *Sanders v. Monroe*, 10 F.2d 997, 998 (D.C. Cir. 1926).

82.     In the event that the Payment Provisions are found to be void *ab initio* for any of these reasons, FiberLight requests that the Court reform the contract to eliminate such provisions, but leave intact the remainder of the ROW Agreement, such that FiberLight can accept assignment of the reformed contract and continue the operation of its network without interruption.

## PRAYER FOR RELIEF

**WHEREFORE**, FiberLight respectfully requests that this Court enter judgment against Amtrak and TWTC:

(1)     declaring that Amtrak has no ownership and/or billable interest in the Union Station Property and therefore does not and never had a right to charge fees to FiberLight, TWTC, or any other third party for access to the Union Station Property;

(2)     declaring that to the extent the ROW Agreement includes Payment Provisions that require or required any payment to Amtrak for the use of the Union Station Property, the Payment Provisions are void *ab initio*;

(3)     declaring that FiberLight does not owe any payment to either TWTC or Amtrak based upon the ROW Agreement;

23

(4)     finding that the Payment Provisions of the ROW Agreement were void *ab initio* as a matter of public policy, and that Amtrak therefore never had a right to charge FiberLight, TWTC, or any other third party for access to the Union Station Property;

(5)     finding that there was a mutual mistake of fact by TWTC and Amtrak in the formation of the ROW Agreement, consisting of a mutual belief that Amtrak had a right to charge fees for the Union Station Property, and that the Payment Provisions of the ROW Agreement are therefore void *ab initio*;

(6)     in the alternative to mutual mistake of fact, finding that Amtrak committed fraud by deceiving TWTC to believe that it had a billable interest in the Union Station Property, when it knew otherwise, and accepting payments from TWTC for access to such Property;

(7)     FiberLight requests that the Court reform the ROW Agreement to eliminate the Payment Provisions but leave the remainder of such Agreement intact to permit FiberLight to carry on the operation of its network and business without renewed disruption;

(8)     FiberLight seeks punitive damages and attorneys' fees from Amtrak in relation to Amtrak's fraudulent inducement of the ROW Agreement, and the subsequent business uncertainty and expense associated with FiberLight's inability to gain assurances of access to its own network and its inability to complete what should have been a routine assignment of the ROW Agreement;

(9)     costs and attorneys' fees; and

(10)    for such other and further relief as this Court deems just and proper.

Respectfully submitted,

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**

_____ */s/ James C. Falvey* _____
James C. Falvey, Esq. (D.C. Bar No. 43195)
Charles A. Zdebski, Esq. (D.C. Bar No. 13840)
Gerit F. Hull (D.C. Bar No. 500736)
1717 Pennsylvania Avenue, N.W.
12th Floor
Washington, DC  20006
Tel:  202-659-6655
Fax:  202-659-6699
Email:  jfalvey@eckertseamans.com
        czdebski@eckertseamans.com
        ghull@eckertseamans.com
*Attorneys for Plaintiff, FiberLight, LLC*

Dated:  July 26, 2013