# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FIBERLIGHT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-cv-1138 (KBJ) |
| | ) | |
| NATIONAL RAILROAD PASSENGER | ) | |
| CORP., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff FiberLight, LLC ("FiberLight") is a Delaware-based company that
constructs, owns, and operates fiber optic cables that carry digital information over long
distances underground.  FiberLight manages a fiber optic cable network that runs from
Maryland to Virginia, and that passes through the District of Columbia.  In this lawsuit,
FiberLight alleges that it has purchased most of the fiber optic cable that lies beneath
the property surrounding Union Station, but that Defendant National Railroad Passenger
Corporation ("Amtrak"), which manages the property, will not permit FiberLight
employees to access that cable for maintenance unless FiberLight involves the former
owner of the cable network, Defendant tw Telecom of DC ("TWTC"), or executes a
right-of-way agreement with Amtrak that includes payment of a fee.  At the heart of this
dispute are two contracts that pertain to the property interests at issue:  (1) an asset
purchase agreement ("Purchase Agreement") between FiberLight and TWTC's
predecessor-in-interest, pursuant to which FiberLight purchased the cable at issue in
this case, and (2) a "Railroad Right-of-Way License Agreement" ("ROW Agreement")
between TWTC and Amtrak, which permits TWTC to access the cable underneath the

Union Station property in exchange for an annual license fee.  It is undisputed that all three parties failed to execute an assignment of TWTC's interest in the ROW Agreement to FiberLight after the Purchase Agreement was signed.  It is also undisputed that TWTC has continued to pay Amtrak the annual access fees owed under the ROW Agreement despite its sale of most of the cable to FiberLight.

In recent months, both TWTC and Amtrak apparently have made clear to FiberLight that they intend to take steps to alter the status quo:  TWTC allegedly has announced that it will not renew the ROW Agreement with Amtrak (an action that apparently would result in ownership of FiberLight's cable vesting to Amtrak under the terms of the ROW Agreement), and TWTC has also demanded that FiberLight reimburse it for the access payments that TWTC has made to Amtrak since FiberLight purchased the cable.  Furthermore, both Defendants allegedly have requested that FiberLight remove its cable entirely.  In response, FiberLight filed the instant complaint, which not only claims that the Union Station property upon which FiberLight's cable is buried was dedicated to public use in 1914 (and thus challenges Amtrak's right to exclude FiberLight and/or to charge access fees), but also seeks a declaratory judgment regarding rights and obligations under the ROW Agreement—a contract to which FiberLight is not a party.

Before this Court at present are two separate motions to dismiss the complaint that Amtrak and TWTC have filed.  (Amtrak Mot. to Dismiss Pl.'s Amended Compl. Pursuant to F.R.C.P. 12(b)(1), 12(b)(6), and 9(b) ("Amtrak's Mot."), ECF No. 24; Def. TW Telecom of D.C. LLC's Mot. to Dismiss ("TWTC's Mot."), ECF No. 23.)  Both Amtrak and TWTC argue that this Court lacks subject matter jurisdiction over most of FiberLight's complaint because FiberLight has not suffered an injury-in-fact and has

requested a declaration of rights under a contract to which it is neither a party nor a third-party beneficiary.  ((Mem. in Supp. of Amtrak's Mot. ("Amtrak's Mem."), ECF No. 24-2, at 28–37; Def. TW Telecom's Mem. in Supp. of TWTC's Mot. ("TWTC's Mem."), ECF No. 23-1, at 16–32.)[1]  Defendants also invoke Federal Rule of Civil Procedure 12(b)(6) to challenge certain of FiberLight's claims for failure to state a claim upon which relief can be granted (Amtrak's Mem. at 13–28, 38–47; TWTC's Mem. at 32–37), and Defendants further argue that this Court should decline to hear the claims that FiberLight has brought under the Declaratory Judgment Act, given the Court's discretion under the Act.  (Amtrak's Mem. at 37–38; TWTC's Mem. at 37–42).

For the reasons explained fully below, this Court concludes that FiberLight lacks standing to bring claims that request clarification or rescission of provisions of the ROW Agreement.  Moreover, to the extent that FiberLight is asking this Court to exercise supplemental jurisdiction over the anticipatory breach claim against TWTC, and also to declare both that FiberLight has a right to access the cable it purchased without being deemed a trespasser and that FiberLight is immune from future suit by TWTC to recover the access fees that TWTC has paid to Amtrak on FiberLight's behalf, this Court is exercising its discretion to decline to provide any such relief. Consequently, both Defendants' motions to dismiss will be **GRANTED**, and this case will be **DISMISSED** without prejudice and in its entirety.  A separate order consistent with this opinion will follow.

---

[1] Page numbers throughout this Opinion refer to those that the Court's electronic filing system assigns.

## I.    BACKGROUND

### A. Factual Background

According to the complaint, a network of fiber optic cables carrying digital information for telephone, cable, and internet use is buried underneath the property surrounding Union Station in the District of Columbia, unbeknownst to most train travelers.  (Am. Compl. ¶ 12.)  Amtrak is a DC-based for-profit railroad corporation that the United States government majority owns; Amtrak manages and leases the property in and around Union Station.  (*Id.* ¶¶ 2, 5.)  TWTC is a Delaware-based telecommunications service provider for businesses in the DC area.  (*Id.* ¶ 3.)  As relevant here, TWTC's predecessor—hereinafter referred to throughout as "TWTC"—owned and serviced the fiber optic cable network that lies beneath the Union Station property in 1999, when that company and Amtrak entered into a right-of-way license agreement that permitted the fiber optics company to access the cable network for maintenance.  (Am. Compl. ¶ 11; *see also* ROW Agreement, Ex. 1 to Amtrak's Mem., ECF No. 24-3, at 5.)

### 1.  The ROW Agreement[2]

Four terms of the ROW Agreement between Amtrak and TWTC are directly relevant to the claims that have been brought in this case.  First, the agreement grants TWTC a "license" for a five-year period, permitting "the construction, installation, operation and maintenance" of fiber optic cable and related equipment in certain specified areas of "raw land around Union Station[.]"  (ROW Agreement §§ 2.1, 2.1.1,

---

[2] The ROW Agreement is not appended to the complaint, but it is repeatedly referenced in FiberLight's amended complaint and is "central to the plaintiff's claim[.]"  *Strumsky v. Washington Post Co.*, 842 F. Supp. 2d 215, 217 (D.D.C. 2012) (quoting *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002)).  Therefore, this Court will consider that document in ruling on each Defendants' motions to dismiss the complaint "without converting the motion[s] to one[s] for summary judgment." *Id.*

3.1; *see also* Am. Compl. ¶ 11.)  The agreement provides that the licensee "shall have the option to renew and extend this Agreement for five (5) consecutive 'Renewal Terms' of five (5) years each[.]"  (*Id.* § 3.1)

Second, the agreement establishes that, in exchange for use of the property, the licensee will pay an "Annual License Fee" to Amtrak.  (ROW Agreement § 3.2; Am. Compl. ¶ 11.)  The agreement specifies that this license fee will be adjusted upward annually.  (ROW Agreement §3.3.)  According to the complaint, the annual fee was $62,164 as of 2002, and it grew to nearly $80,000 in 2013.  (Am. Compl. ¶ 11.)

Third, the ROW Agreement specifically provides that the licensee "shall not assign, sell, sublease or transfer" its rights or obligations under the contract or "sublease all or any part of the Licensed Premises or the [fiber optic cable] without [Amtrak's] consent."  (ROW Agreement § 5.1.)  Furthermore, with respect to third parties, the ROW Agreement provides that "[n]othing contained in this Agreement, express or implied, is intended to confer on any person other than the parties hereto or their respective successor and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement."  (*Id.* § 14.10.)  The contract also states that the ROW Agreement "shall be binding upon and shall inure to the benefit of both parties hereto and their respective . . . assigns."  (*Id.* § 14.12.)

Fourth and finally, the ROW Agreement contains a series of provisions that address ownership and removal of the fiber optic cable network ("FOC") if the agreement expires or is terminated.  Two such provisions are relevant to the arguments the parties make here; these two provisions state as follows:

> 4.2   <u>Ownership Upon Termination</u>.   Upon the expiration of this Agreement, or termination of the Agreement for any reason, Licensee shall notify Licensor as to whether Licensee intends to retain title and ownership of the FOC, and if Licensee has not already removed the

FOC and/or if Licensee does not so notify Licensor within ninety (90) days of such expiration or termination, title to and ownership of the FOC shall immediately and completely vest in Licensor, without the need for either party to take any action or execute any document . . . . If Licensee notifies Licensor that it intends to retain such title and ownership of the FOC, Licensee shall remove the FOC in accordance with Section 4.3. . . .

4.3  Removal of the FOC.  Within ninety (90) days of expiration of this Agreement or termination of this Agreement for any reason, Licensor may require Licensee in writing to remove all or any portion of the FOC from the Licensed Premises . . . and Licensee shall remove the FOC solely at its own expense within one-hundred eighty (180) days of receiving notice from Licensor requiring such removal. . . .  If Licensee fails to remove the FOC from the Licensed Premises after Licensor requests such removal pursuant to this Section 4.3, Licensor may hire contractors to remove the FOC, and Licensee shall . . . reimburse Licensor for all costs and expenses incurred by Licensor for such removal.

(*Id.* §§ 4.2, 4.3.)

2.  The TWTC-FiberLight Asset Purchase Agreement

The complaint alleges that TWTC operated and maintained a fiber-optic network in and around Union Station in accordance with the terms of the ROW Agreement and as a licensee of Amtrak from March 1, 1999, until May 9, 2005—the date on which FiberLight closed a deal to purchase "virtually all of TWTC's fiber optic cable network under and around the Union Station Property, including all related facilities, ducts conduit, and ancillary equipment."  (*Id.* ¶ 13; *see also* Asset Purchase Agreement ("Purchase Agreement"), Ex. 1 to Am. Compl., ECF No. 16-1, §§ 2.01, 2.04, 2.05 (noting that as of the closing date and upon payment of consideration, ownership in the fiber optic cable vests to FiberLight).)[3]  As relevant here, the specific terms of the Purchase Agreement are as follows.

---

[3] According to the complaint, "[t]here was a small segment of fiber in the area that TWTC retained and was not subject to the Asset Purchase Agreement[.]"(Am. Compl. ¶ 13.)  Although not relevant here, the complaint notes that this cable portion was "sold later to FiberLight." (*Id.*)

The Purchase Agreement provides that the Seller (TWTC) will transfer the assets (the fiber optic cable network) to the Buyer (FiberLight) in exchange for $7,480,000 in cash. (*See* Purchase Agreement §§ 2.04, 2.05.)  Pursuant to the terms of the Purchase Agreement, TWTC and FiberLight also agree that "[a]ll contracts material to the operation of Seller's business in the ordinary course of business are being assigned to Buyer pursuant to this Agreement" (*id.* § 3.05), and that "no consent, waiver of approval of any party to such an Assigned Contract is necessary for the execution and delivery of this Agreement or the consummation by Seller of the transactions contemplated hereby" (*id.*).  Furthermore, the Purchase Agreement states that "all permits and licenses required for operation" of the business "may be transferred or reissued" to FiberLight "without the approval of any third party[.]" (*Id.* § 3.06(b).) The ROW Agreement is one of the Seller's licenses that the Purchase Agreement lists as subject to assignment to the Buyer. (Am. Compl. ¶ 15; Purchase Agreement §§ 2.01(d), 2.01(o), 3.05; *id.* Schedule 3.06(b).)

### 3. The Parties' Stalemate Over Assignment Of The ROW Agreement

According to the complaint, FiberLight has owned and operated the fiber optic cable at issue since execution of the Purchase Agreement in 2005, and, accordingly, has provided telecommunications services to its customers using that cable. (Am. Compl. ¶ 17.)  Meanwhile, in the years since the Purchase Agreement was executed, TWTC and FiberLight have executed and completed assignment of each of the licenses and contracts related to operation and maintenance of the cable network, *except* for TWTC's interest in the ROW Agreement. (*Id.* ¶¶ 18–19.)  The complaint emphasizes that FiberLight does not have a right-of-way to access its fiber optic cable network even to this day—nearly 10 years after FiberLight purchased the cable; apparently, this

7

extended and persistent delay in assigning the ROW Agreement has at least two causes, each of which is addressed in detail in FiberLight's complaint.

First, there were hiccups in the normal negotiation processes related to reaching consensus on the terms of the assignment.  FiberLight alleges that it submitted a draft ROW Agreement to Amtrak in September of 2006—16 months after the Purchase Agreement was executed—and that Amtrak responded with edits on July 16, 2007.  (*Id.* ¶¶ 21–22.)  As part of these negotiations, FiberLight wanted a "walk-through" of where the cable was placed in Union Station so that it could determine how much of the fiber optic cable FiberLight owned and how much TWTC had retained so that the parties' respective lease payments to Amtrak could be apportioned properly.  (*See id.* ¶¶ 23, 25.) Arranging this walk-through took time because, allegedly, Amtrak would not let FiberLight onto the property without TWTC's permission, given that TWTC was the only party with a legal right-of-way to access the property.  (*See id.* ¶¶ 25–26.) FiberLight also alleges that the negotiations were delayed due to an unrelated outstanding financial issue with TWTC.  (*Id.* ¶ 24.)  Eventually, the financial issue was resolved and TWTC facilitated the requested walk-throughs, which apparently were not completed until early 2011, nearly six years after FiberLight purchased the fiber optic cable at issue.  (*Id.* ¶¶ 24, 26.)

Second, although the parties supposedly restarted negotiations over assignment of the ROW Agreement in early 2013 (*id.* ¶ 29), in May of 2013, FiberLight allegedly discovered documents that, in its view, cast doubt on Amtrak's legal authority to charge lease fees for a right-of-way to access the property in and around Union Station.  (*Id.*) Specifically, FiberLight reviewed detailed land records of the Baltimore & Ohio Railroad Company, which, according to the complaint, indicate that the tracks at Union

Station were "dedicated to public use" in 1914.  (*See id.* ¶ 29 (citing Interstate

Commerce Comm'n Valuation Order No. 7 (Nov. 21, 1914)).)  As a result, FiberLight

suspected that "it is no longer lawful for Amtrak or any other entity to charge fees for

access to such land" (*id.* (citing *Payne v. Godwin*, 133 S.E. 481, 483 (Va. 1926))), and

it sent a letter to Amtrak requesting proof of ownership and authority to charge a fee for

accessing the property (*id.* ¶ 30).  Amtrak refused to provide any such proof, stating by

return letter that it "has no contract with FiberLight; owes no obligations to FiberLight

and hence, need not make any representations to FiberLight."  (*Id.*)

        One month later, in June of 2013, FiberLight announced that it would no longer

accept assignment of the ROW Agreement absent proof that Amtrak owned the property

and had authority to charge a fee.  (*Id.* ¶ 31.)  At the same time, FiberLight also offered

to enter into an alternative right-of-way agreement that reduced the amount of the lease

fees set forth in the ROW Agreement.  (*Id.* ¶¶ 31–32.)  FiberLight alleges that it

repeatedly reached out to Amtrak to negotiate, but Amtrak refused.  (*Id.* ¶¶ 32–36.)

Instead, Amtrak allegedly threatened to remove FiberLight's cable because the fiber

optic cable network was not being maintained by TWTC pursuant to the ROW

Agreement.  (*Id.* ¶ 36.)  Thus, according to the complaint, FiberLight currently has no

right-of-way agreement with Amtrak to enter the Union Station property to maintain its

cable, and the parties have reached a stalemate regarding assignment of the existing

ROW Agreement—*i.e.*, FiberLight refuses to accept assignment of the ROW Agreement

until Amtrak provides proof that it has authority to charge an access fee, and Amtrak

refuses to supply any such proof, on the grounds that it is not in privity with FiberLight

and thus does not owe FiberLight any such obligation.  (*Id.* ¶¶ 47, 50.)  In the

meantime, for its part, TWTC has continued to pay annual license fees to Amtrak

pursuant to the ROW Agreement for a fiber optic cable network that FiberLight now owns.  (*Id.* ¶ 39.)

        4.  <u>The Recent Changed Circumstances</u>

      The complaint alleges that a series of events occurred in the summer of 2013 that brought this matter to a head and prompted FiberLight to file the instant lawsuit.  First, on June 5, 2013, TWTC sent FiberLight a letter demanding reimbursement from FiberLight for the more than $540,000 TWTC has paid to Amtrak pursuant to the terms of the ROW Agreement since FiberLight purchased the cable network.  (*Id.* ¶ 42.)  FiberLight alleges that TWTC is requiring repayment of these fees as a condition of assigning its interest in the ROW Agreement to FiberLight.  (*Id.* ¶ 47.)  Then, both TWTC and Amtrak sent FiberLight a number of letters between June 23, 2013, and July 22, 2013, allegedly demanding that FiberLight either execute an assignment of the ROW Agreement or remove its fiber optic cable from the Union Station property altogether.  (*Id.* ¶¶ 48–49.)  In one of these letters, TWTC imposed a deadline of July 31, 2013.  (*Id.* ¶ 48.)  Furthermore, on August 8, 2013, TWTC provided notice to Amtrak that it does not intend to renew the ROW Agreement beyond its expiration date (March 1, 2014), which means that, in accordance with the terms of the ROW Agreement, ownership in the cable network allegedly would vest to Amtrak.  (*Id.* ¶ 52.)[4]

      FiberLight's complaint asserts that the parties are now in an untenable and unsustainable position as a result of all this.  (*Id.* ¶ 17.)  According to FiberLight, although TWTC cannot exercise any property rights with respect to ownership of the cable network that TWTC sold to FiberLight pursuant to the Purchase Agreement, TWTC's decision not to renew the unassigned ROW Agreement does just that, because

---

[4] Per a stipulation of the parties that was reached after this case was filed, the ROW Agreement will not be deemed to have expired, nor will it be terminated, until at least 90 days after entry of a final order resolving this case.  (Stip., ECF No. 33-1, ¶ 1.)

it permits ownership of the fiber optic cable to vest in Amtrak under the terms of that agreement. (*Id.* ¶ 55 (interpreting TWTC's notice that it will not renew the ROW Agreement as a "claim[] that TWTC owns the [fiber optic cable] that it previously sold to FiberLight").)  In addition, FiberLight points out, "TWTC insists that FiberLight is neither a party nor a third party beneficiary to the ROW Agreement," and yet "it nonetheless complains about FiberLight's 'refusal to remit the license fees requested by Amtrak.'" (*Id.* (citation omitted).)  FiberLight also maintains that the parties' dispute over the assignment of rights and the reimbursement of fees "obscure[s] the real question to be resolved, *'Does Amtrak have a right to charge a fee in the first place*?'" (*Id.* (emphasis in original).)  Thus, according to FiberLight, it has filed the instant lawsuit as an intended third-party beneficiary of the ROW Agreement in order to get to the bottom of the rights and responsibilities that each of the parties has with respect to the disputed fiber optic cable network.  (*Id.* ¶ 9.)

## B. Procedural History

### 1. FiberLight's Complaint

FiberLight filed its initial complaint in this matter on July 26, 2013, naming Amtrak and TWTC as Defendants (Compl., ECF No. 1); it filed an amended complaint on September 30, 2013.  As the introductory paragraphs of the amended complaint make clear, FiberLight's action "is a suit pursuant to the Federal Declaratory Judgment Act[,]" and FiberLight requests not only that "the Court declare the rights and obligations of the three Parties," but also that it determine, in particular, whether Amtrak has a "right to license, for a significant annual fee, the use of certain property in and around Union Station" and "to remove portions of a fiber optic network owned by FiberLight from land that has been dedicated to the public use."  (Am. Compl. ¶ 9.) FiberLight also requests that the Court "declare certain provisions of an Amtrak

11

contract with TWTC giving TWTC access to certain rights-of-way in and around Union Station void *ab initio* because the contract is: a) contrary to public policy, and b) based upon mutual mistake of fact or, in the alternative, based upon fraud." (*Id.* ¶ 10.)

FiberLight's amended complaint specifically delineates eight causes of action. The First Claim For Relief, which is against Amtrak, seeks a declaration that (a) FiberLight is not trespassing on Amtrak's property; (b) Amtrak cannot treat FiberLight as a trespasser; (c) Amtrak cannot deny FiberLight a right of way; and (d) Amtrak cannot take ownership of FiberLight's fiber optic cable. (*Id.* ¶ 63.) The Second Claim For Relief, which is against TWTC, requests a declaration that (a) FiberLight does not owe TWTC any rights-of-way payments under the Purchase Agreement; (b) TWTC cannot obstruct FiberLight's access to the rights-of-way related to the fiber optic cable; (c) TWTC cannot force FiberLight to remove the fiber optic cable; and (d) TWTC cannot convey ownership of the fiber optic cable to Amtrak. (*Id.* ¶ 71.) In the Third Claim For Relief, FiberLight maintains that "[t]here is currently uncertainty" regarding, among other things, "the relationship between FiberLight, Amtrak, and TWTC in relation to the Union Station Property" (*id.* ¶ 72); therefore, FiberLight seeks a declaration clarifying that (a) Amtrak has no right to charge fees to access the property at issue because it is dedicated to public use; (b) the payment provisions of the ROW Agreement are void *ab initio*; (c) the remainder of the ROW Agreement remains in effect; and (d) FiberLight does not owe any payments to either Defendant under the ROW Agreement (*id.* ¶ 80).

The remaining five counts all seek declarations that are premised on common law contract claims and overlap with those requested in the first three counts. In the Fourth Claim For Relief, FiberLight asserts that the payment provisions of the ROW

12

Agreement are void *ab initio* as a matter of public policy, such that FiberLight owes no payments to either TWTC or Amtrak, and requests a declaration saying as much. (*Id.* ¶ 87.) The Fifth and Sixth Claims For Relief seek similar declarations regarding the unenforceability of the payment provisions in the ROW Agreement. Specifically, FiberLight pleads in the alternative either that the payment provisions of the ROW Agreement should be rescinded based on the parties' mutual mistake of fact—*i.e.*, Amtrak and TWTC's erroneous belief that Amtrak could charge and collect payments for access to the property where the fiber optic cable is located (*id.* ¶ 94 (Fifth Claim))—or that the payment provisions of the ROW Agreement are void *ab initio* because Amtrak engaged in fraud in the inducement by including payment provisions when it knew that it was not legally entitled to charge a fee for this use (*id.* ¶¶ 98, 101–02 (Sixth Claim)).[5]

In the Seventh Claim For Relief, FiberLight maintains that it is "a third party beneficiary of the ROW Agreement" (*id.* ¶ 109), and as such, asks the Court to reform the ROW Agreement to eliminate the purportedly improper payment provisions but "leave intact" the remaining provisions of the agreement, "such that FiberLight can accept assignment of the reformed contract and continue the operation of its network without interruption" (*id.* ¶ 109). Finally, in the Eighth Claim for Relief, FiberLight asks the Court to find that TWTC's actions in declining to renew the ROW Agreement amount to a "transfer [of] ownership" of the fiber optic cable to Amtrak "or otherwise interfere with FiberLight's ownership" of the fiber optic cable in a manner that constitutes anticipatory breach of the Purchase Agreement. (*Id.* ¶¶ 112, 114, 117.)

---

[5] With respect to the sixth claim, FiberLight requests not only that the contract be voided but also that punitive damages and attorneys' fees be awarded in connection with this purported fraud. (*Id.* ¶ 105.)

## 2. Defendants' Motions To Dismiss

On November 4, 2013, TWTC and Amtrak each filed motions to dismiss.

Defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)

for myriad reasons.  With respect to Rule 12(b)(1), Defendants argue that this Court

lacks subject matter jurisdiction regarding certain of FiberLight's claims—those that

request invalidation or clarification of provisions of the ROW Agreement—because,

according to Defendants, FiberLight is neither a party to, nor a third-party beneficiary

of, the ROW Agreement and thus lacks prudential standing to sue for a declaration of

the rights that arise under that agreement.  (Amtrak's Mem. at 28–34; TWTC's Mem. at

19–23.)  Defendants also maintain that the existing ROW Agreement—which

FiberLight refuses to accept—has not resulted in any cognizable injury to FiberLight

that would give rise to constitutional standing.  (*See* Amtrak Mem. at 35–36; TWTC

Mem. at 29–30.)  Similarly, TWTC asserts that "there simply is no controversy"

between it and FiberLight that gives rise to standing to sue because TWTC is in privity

with FiberLight only with respect to the Purchase Agreement, and "[t]here is no dispute

between the parties as to whether right-of-way fees are owed" under that agreement.

(TWTC's Mem. at 26.)

Defendants also move to dismiss some, but not all, of FiberLight's claims for

failure to state a claim under Rule 12(b)(6).  Amtrak argues that FiberLight has failed to

allege sufficient facts to support its request for declarations establishing FiberLight's

right to access its cable without paying a fee and without being deemed a trespasser.

(Amtrak's Mem. at 13–20.)  Amtrak also points out that FiberLight has alleged fraud as

one of the bases for the requested reformation of the ROW Agreement, and that fraud

claims are governed by Rule 9(b)'s heightened pleading standard, which, in Amtrak's

view, FiberLight has not met.  (*Id.* at 41–44.)  Amtrak further maintains that the ROW

14

Agreement contains a binding arbitration clause—which would constrain FiberLight to proceed by arbitration and not suit even if it is deemed a beneficiary of the ROW Agreement (*id.* at 8–9)—and Amtrak also argues that all of FiberLight's claims should be dismissed as time-barred (*id.* at 45–47).

TWTC trains its Rule 12(b)(6) fire on FiberLight's Eighth Claim for Relief—the contention that TWTC's decision to terminate the ROW Agreement with Amtrak amounts to anticipatory breach of the Purchase Agreement between FiberLight and TWTC.  (*See* TWTC's Mem. at 32–37.)  TWTC argues that "[a]n anticipatory breach claim requires a clear expression of the intent to commit a breach of contract" (*id.* at 35), but that FiberLight has failed to provide any allegation that would support the conclusion that TWTC has expressed this intention in any respect (*id.* at 34–35). Indeed, according to TWTC, "FiberLight cannot identify a single incident in the eight years since the execution of the [Purchase Agreement] where [TWTC] has disputed FiberLight's ownership" of the cable at issue.  (*Id.* at 27.)

Finally, both Defendants insist that FiberLight's own intransigence as far as accepting the payment terms of the existing right-of-way agreement (or any new one) is the cause of the problem that FiberLight seeks to have remedied, and thus, this Court should equitably decline to consider FiberLight's request for a declaratory judgment. (Amtrak's Mem. at 37–38; TWTC's Mem. at 37–42.)  In this regard, Defendants point to FiberLight's own dilatory conduct with respect to securing the required assignment of rights (*see* Amtrak's Mem. at 37 (asserting that "any alleged 'injury' to FiberLight is self-inflicted"); TWTC's Mem. at 41 ("FiberLight stalled the execution of an assignment of the ROW Agreement for over seven years")), and assert that, even as FiberLight was "refus[ing] to remit the license fees" and thereby blocking acceptance of

the assignment, it "appears to have been using the [cable network] in question without authorization from Amtrak" (TWTC's Mem. at 41). Therefore, according to TWTC, "[a]ny sense of urgency FiberLight now feels in resolving this matter is the result of its potential unlawful use" of the cable network over the years such that its lawsuit merely constitutes an unacceptable "anticipatory defense against potential claims" against FiberLight. (*Id.* at 42.)

This Court held oral argument on Defendants' motions to dismiss on April 24, 2014, and these motions are now ripe for disposition.

## II.   LEGAL STANDARDS

### A.   Constitutional and Prudential Standing

In order for a federal court to have subject matter jurisdiction over a plaintiff's claims, the plaintiff must satisfy both constitutional and prudential standing requirements. *See Nat'l Recycling Coal., Inc. v. Browner*, 984 F.2d 1243, 1248 (D.C. Cir. 1993). Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies," U.S. Const. art. 3, § 2, and no less an authority than the Supreme Court of the United States has clarified that, in order to satisfy Article III, a plaintiff must allege an "injury in fact" that is "fairly traceable to the challenged action of the defendant" and capable of being "redressed" by the Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks, alterations, and citations omitted). In other words, "the [constitutional] standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). "In this sense, the standing requirement acts as a gatekeeper, opening the courthouse doors to narrow disputes that can be resolved

merely by reference to facts and laws, but barring entry to the broad disquiets that can be resolved only by an appeal to politics and policy." *Food & Water Watch, Inc. v. Vilsack*, No. 14-CV-1547, 2015 WL 514389, at \*6 (D.D.C. Feb. 9, 2015).

Additionally, courts have also imposed a number of prudential standing requirements; that is, requirements that are designed "to limit the role of the courts in resolving public disputes" as a matter of policy. *Warth*, 422 U.S. at 500. One such prudential requirement is that a party cannot sue to enforce or challenge the terms of a contract to which it is neither a party nor a third-party beneficiary. *See Deutsche Bank Nat. Trust Co. v. FDIC*, 717 F.3d 189, 194 (D.C. Cir. 2013); *Bowhead Info. Tech. Servs., LLC. v. Catapult Tech. Ltd.*, 377 F. Supp. 2d 166, 171 (D.D.C. 2005). Another prudential requirement is that a plaintiff "may assert the rights" of a party to a contract, or those of any other third party, but "only when there is 'some hindrance to the third party's ability to protect his or her own interests[.]'" *Rumber v. District of Columbia*, 595 F.3d 1298, 1301 (D.C. Cir. 2010) (quoting *Goodman v. FCC*, 182 F.3d 987, 992 (D.C. Cir. 1999)). In this regard, there are at least three well-settled requirements of third-party standing: (1) "the plaintiff must have a close relationship with the real party in interest," (2) "the litigation must have an impact upon the rights of that third party," and (3) "there must be a barrier keeping that party from asserting its rights." *U.S. House of Representatives v. Dep't of Commerce*, 11 F. Supp. 2d 76, 88 (D.D.C. 1998) (internal quotation marks and citations omitted)).

Notably, a plaintiff must demonstrate that it has both prudential and constitutional standing for each claim and form of relief sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006). Moreover, "[f]ederal courts may consider . . .

prudential standing even before Article III standing[.]"  *Deutsche Bank*, 717 F.3d at 194
n.4.

### B.      Claims Brought Under The Declaratory Judgment Act

The Declaratory Judgment Act, 28 U.S.C. § 2201 (2012), provides, in relevant

part, that "[i]n a case of actual controversy within its jurisdiction," a "court of the

United States, upon the filing of an appropriate pleading, may declare the rights and

other legal relations of any interested party seeking such declaration, whether or not

further relief is or could be sought."  28 U.S.C. § 2201(a).  In other words, the

Declaratory Judgment Act "settle[s] legal rights and remove[s] uncertainty and

insecurity from legal relationships without awaiting a violation of the rights or a

disturbance of the relationships."  *Am. Fed'n of Gov't Emps. v. O'Connor*, 747 F.2d

748, 759 (D.C. Cir. 1984) (internal quotation marks and citations omitted); *see also*

*Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1532 n.137 (D.C. Cir. 1984).

Like all other civil cases, claims brought under the Declaratory Judgment Act

must stem from an "actual controversy," which is a question of degree that asks

"whether the facts alleged, under the circumstances, show that there is a substantial

[conflict], between parties having adverse legal interests, of sufficient immediacy and

reality to warrant the issuance of a declaratory judgment."  *Maryland Cas. Co. v. Pac.*

*Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *see also Aetna Life Ins. Co. v. Haworth*, 300

U.S. 227, 240–41 (1937) (explaining that an "actual controversy" is "a difference or

dispute" that is "definite and concrete, touching the legal relations of parties having

adverse legal interests[,]" rather than "an opinion advising what the law would be upon

a hypothetical state of facts").  A case based on the legal consequences of potential

future conduct does not present an actual controversy, "since the conduct may not take

place and if it does the other party may not challenge it."  10B Charles Alan Wright,

Arther R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2757 (3d ed. 1998).  However, if one or both of the parties have taken steps or pursued a course of conduct that would result in "imminent" and "inevitable" litigation absent a declaration, then a declaratory judgment is appropriate.  *Id.*

Significantly, even if there is an actual controversy and the plaintiff has standing to file suit for a declaratory judgment, district courts have discretion to decline to provide declaratory relief under the Declaratory Judgment Act.  *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) (noting that the Declaratory Judgment Act "created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants").  Consequently, "it is well settled that a declaratory judgment always rests within the sound discretion of the court."  *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980)(citation omitted).

### C. Motions To Dismiss Under Rules 12(b)(1) and 12(b)(6)

A motion to dismiss a complaint for lack of standing is reviewed under Federal Rule of Civil Procedure 12(b)(1).  *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("[T]he defect of standing is a defect in subject matter jurisdiction."); *Little v. Fenty*, 689 F. Supp. 2d 163, 166 n.3 (D.D.C. 2010) (same).  In response to a Rule 12(b)(1) motion to dismiss, a plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011) (citing *Lujan*, 504 U.S. at 561); *Halcomb v. Office of the Senate Sergeant-at-Arms of the U.S. Senate*, 209 F. Supp. 2d 175, 176 (D.D.C. 2002). Moreover, in reviewing a motion to dismiss pursuant to Rule 12(b)(1), the court "may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case."  *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) (citing *Herbert v. Nat'l Acad. of Scis.*,

974 F.2d 192, 197 (D.C. Cir. 1992)); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402

F.3d 1249, 1253 (D.C. Cir. 2005).  The court must accept as true all of the factual

allegations in the complaint and draw all reasonable inferences in favor of the plaintiff,

*Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008); however, it need

not "accept inferences unsupported by the facts alleged or legal conclusions that are

cast as factual allegations[,]" *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001).

Moreover, "[t]he court must scrutinize the plaintiff's allegations more closely when

considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under . . .

12(b)(6)." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011)

(citing *Macharia v. United States*, 334 F.3d 61, 62, 69 (D.C. Cir. 2003)).

By contrast, when reviewing a motion to dismiss under Rule 12(b)(6), the court

must not only accept as true all factual allegations in the complaint, but it must also

afford the plaintiff the benefit of all inferences that can be derived from the facts

alleged.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 663, 678 (2009); *Sparrow v. United Air

Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).  Because a Rule 12(b)(6) motion

tests the sufficiency of the complaint's allegations, "the complaint is to be construed

liberally in plaintiff's favor"; however, "the Court need not accept inferences drawn by

the plaintiff if those inferences are unsupported by facts alleged in the complaint; nor

must the Court accept plaintiff's legal conclusions." *Kramer v. United States*, 460 F.

Supp. 2d 108, 110 (D.D.C. 2006) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d

1271, 1276 (D.C. Cir. 1994)).

To withstand a Rule 12(b)(6) motion, a plaintiff must plead enough facts to make

the claim seem plausible on its face.  *Iqbal*, 556 U.S. at 678; *see also Iqbal v. Hasty*,

490 F.3d 143, 157–58 (2d Cir. 2007) (finding that a pleader must "amplify a claim with

some factual allegations in those contexts where such amplification is needed to render the claim plausible"). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotation marks and citations omitted). In other words, the plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* "Mere conclusory statements" of misconduct are not enough to make out a cause of action against a defendant. *Id.*

## III.   ANALYSIS

As explained above, Amtrak, TWTC, and FiberLight allegedly have property interests that relate to the fiber optic cable network running underneath Union Station, and these interests arise out of two separate contractual agreements—the Purchase Agreement between FiberLight and TWTC, and the ROW Agreement between TWTC and Amtrak. To date, FiberLight has not managed to secure an assignment of the ROW Agreement (evidently due to FiberLight's refusal to pay any fee for this easement), and the parties have not executed any other right-of-way agreement that would provide FiberLight with a right to access the fiber optic cable network that it indisputably owns. As a result, FiberLight maintains that there is "uncertainty and insecurity" regarding the parties' relative property interests (Am. Compl. ¶ 63), and it has asked this Court to clear things up by, in essence, declaring that FiberLight has the right to access its cable network without the payment of a fee, and by nullifying any right that Amtrak and TWTC would otherwise have to seek prospective or retrospective payment of any such fee from FiberLight.

For simplicity's sake, this Court views the eight multifaceted counts in FiberLight's complaint as seeking four different categories of relief: (1) a declaration

that Amtrak cannot charge fees for the use of its property as it does in the ROW

Agreement or, at the very least, that FiberLight does not need to pay any such fee; (2)

an order rescinding and/or voiding the fee payment provisions of the ROW Agreement

(which presumably would make the ROW Agreement palatable enough to FiberLight

that it would be willing to accept assignment of that agreement); (3) a declaration that

TWTC can neither convey ownership of FiberLight's cable to Amtrak—as would occur

automatically under the terms of the ROW Agreement if the ROW Agreement is

terminated—nor seek to recover from FiberLight the fees that TWTC has already paid

Amtrak pursuant to the ROW Agreement for FiberLight to access its cable; and (4) a

declaration that Amtrak cannot prevent FiberLight from accessing its cable or claim

ownership of FiberLight's cable at any time.  (*See* Am. Compl. at 33–35 ("Prayer for

Relief").)  For the reasons explained below, this Court concludes that FiberLight lacks

standing to raise any claim that arises under the provisions of the ROW Agreement

(categories (1) and (2)), and the Court declines to exercise its discretion to consider

FiberLight's remaining claims (categories (3) and (4)), which, at bottom, seek

adjudication of FiberLight's property rights as the owner of the fiber optic cable

network vis-à-vis Amtrak and TWTC under the Declaratory Judgment Act and/or as a

matter of state common law.

### A. FiberLight Lacks Standing To Bring Any Claim Arising Under The Provisions Of The ROW Agreement

FiberLight repeatedly asserts in no uncertain terms that the gravamen of its

complaint and the core of its action for a declaratory judgment in this case is its belief

that Amtrak has no right to charge fees for access to the property underneath which

FiberLight's cable is buried because that property was dedicated to public use in 1914.

(*See, e.g.*, Pl.'s Consolidated Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n"), ECF No.

25, at 12 ("FiberLight has alleged that Amtrak does not own the rights-of-way at issue in this case and that, in fact, those rights-of-way were dedicated to public use in 1914, long before Amtrak existed."); *see also* Compl. ¶ 55 (accusing Amtrak and TWTC of "attempt[ing] to obscure the real question to be resolved, '*Does Amtrak have a right to charge a fee in the first place*?'").)  As the complaint makes clear, the operative document in which Amtrak allegedly extracts the improper right-of-way fees is the ROW Agreement between Amtrak and TWTC; consequently, not only has FiberLight refused to accept assignment of that agreement, it has also filed this action to attack the ROW Agreement's fee payment provisions from a number of different angles.  (*See, e.g.*, Am. Compl. ¶ 79 ("FiberLight submits that the payment provisions of the ROW Agreement are invalid, illegal and unenforceable, given that Amtrak does not have a billable interest in the real property it purports to license."); *id.* ¶ 84 ("The Payment Provisions of the ROW Agreement should be declared by this Court to be void *ab initio*" as a matter of public policy.); *id.* ¶ 94 ("FiberLight requests that this Court declare the Payment Provisions of the ROW Agreement to be void *ab initio*, based upon a mutual mistake of fact[.]"); *id.* ¶ 102 ("Amtrak engaged in fraud in the inducement of the ROW Agreement" and, on that basis, the Court should declare the payment provisions "null and void"); *see also id.* ¶ 109 ("In the event that the Payment Provisions are found to be void *ab initio* for any of these reasons, FiberLight requests that the Court reform the contract to eliminate such provisions, but leave intact the remainder of the ROW Agreement, such that FiberLight can accept assignment of the reformed contract and continue the operation of its network without interruption.").)[6]

---

[6] As this Court reads the complaint, FiberLight has also launched an implicit attack on the provisions of the ROW Agreement that relate to termination of the agreement, which FiberLight maintains will ultimately result in an improper conveyance of FiberLight's cable to Amtrak, given TWTC's recent representations regarding its intent to terminate that agreement.  (*See* Am. Compl. ¶ 52 (alleging that

This Court has considered, first, whether FiberLight has prudential standing to raise claims that pertain to the provisions of the ROW Agreement, and second, whether FiberLight has satisfied the constitutional standing prerequisites for bringing a claim that challenges Amtrak's right to charge fees as part of any right-of-way agreement.  As explained below, the answer to both of these questions is "no."

1. <u>FiberLight Lacks Prudential Standing To Bring Claims That Relate To Provisions Of The ROW Agreement</u>

As noted above, under the prudential standing doctrine, a person can sue for enforcement, interpretation, or rescission of a contract only if that person is a party to, or a third-party beneficiary of, that contract.  *Deutsche Bank*, 717 F.3d at 194.  It is undisputed that FiberLight is not a party to the ROW Agreement; therefore, FiberLight's primary argument that it satisfies this prudential standing requirement with respect to its ROW Agreement-related claims is its contention that FiberLight is an intended third-party beneficiary of the ROW Agreement.  (*See* Am. Compl. ¶ 16; Pl.'s Opp'n at 38 (arguing, among other things, that FiberLight qualifies as a third-party beneficiary because TWTC has a legal obligation to assign its interest in the ROW Agreement to FiberLight pursuant to the Purchase Agreement).)  FiberLight also maintains that, even if it is not properly considered a third-party beneficiary of the ROW Agreement, it has the right to press party TWTC's interest in reformation or rescission of that agreement because FiberLight "has a vested interest" in that contract.  (FiberLight's Opp'n at 40 (citing *Playboy Enters., Inc. v. Pub. Serv. Comm'n of Puerto Rico*, 906 F.2d 25, 37 (1st Cir. 1990)).)  FiberLight is mistaken on both counts.

---

TWTC informed Amtrak by letter dated August 8, 2013, that TWTC "would not exercise its option to renew the ROW Agreement"); *see also id.* ¶ 68 (quoting that letter from TWTC as stating that it "does not intend to retain title or ownership of" the fiber optic cable network "as that term is defined in the Agreement" and thus that the cable "will vest to Amtrak" (internal quotation marks omitted)).)

With respect to FiberLight's third-party beneficiary argument, it is well established that, in order to be deemed a third-party beneficiary of a contract, a plaintiff must demonstrate that the parties to the contract "intended to create and did create enforceable contract rights in the third party." *Sealift Bulkers, Inc. v. Republic of Arm.*, 95-cv-1293, 1996 WL 901091, at *4 (D.D.C. Nov. 22, 1996); *see also Oehme, van Sweden & Assocs. v. Maypaul Trading & Servs. Ltd.*, 902 F. Supp. 2d 87, 100 (D.D.C. 2012). Courts typically look to the contract's language to determine the intent of the contracting parties, *see, e.g.*, *Anderson v. D.C. Hous. Auth.*, 923 A.2d 853, 863 (D.C. 2007); *A.S. Johnson Co. v. Atl. Masonry Co.*, 693 A.2d 1117, 1122 (D.C. 1997), and extrinsic evidence may also be considered when the terms of the contract do not expressly resolve the parties' intent. *See Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1065–67 (D.C. 2008) (considering contemporaneous statements of the contractual parties where intent was not clear from the plain terms of the contract).

Here, the ROW Agreement expressly provides that "[n]othing contained in this Agreement, express or implied, is intended to confer on any person *other than the parties hereto or their respective successors and assigns*, any rights, remedies, obligations or liabilities under or by reason of this Agreement." (ROW Agreement § 14.10 (emphasis added).) By its plain terms, then, the ROW Agreement establishes the signing parties' intent that third-party beneficiary status would be limited to the parties' successors and assignees, which means that FiberLight must qualify as such a successor or assignee in order to be properly considered a third-party beneficiary. *See, e.g.*, *Oehme, van Sweden*, 902 F. Supp. 2d at 100 (holding that plaintiff was not a third-

25

party beneficiary, in part because plaintiff did not fall into any of the enumerated categories of beneficiaries).

FiberLight predictably insists that it fits comfortably within the ROW Agreement's reference to "successors and assigns," and thus should be deemed a third-party beneficiary of that contract, because TWTC has an obligation under the Purchase Agreement to assign to FiberLight its interest in the ROW Agreement.  (*See* Pl.'s Opp'n at 39.)  But an entity that has contracted for an assignment and has yet to accept that assignment is merely a *potential* assignee, as distinguished from an *actual* assignee. *See Superlease Rent-A-Car, Inc. v. Budget Rent-A-Car of Md.*, 89-cv-0300, 1989 WL 39393, at *3–*4 (D.D.C. Apr. 13, 1989); *see also Alpha One Transporter, Inc. v. Perkins Motor Transp., Inc.*, No. 13-CV-2662-H-DHB, 2014 WL 4537012, at *4 (S.D. Cal. Sept. 11, 2014) ("An obligation to assign rights does not create a present right in the potential assignee and does not establish standing."); *cf. Jackson v. Culinary Sch. of Wash.*, 788 F. Supp. 1233, 1265 n.34 (D.D.C. 1992) (noting that a third parties' "status as a 'potential assignee' of the putative class members does not confer standing to sue").  And there is nothing in the ROW Agreement or otherwise that suggests that Amtrak and TWTC intended to confer third-party beneficiary right-to-sue status upon entities that are considering accepting assignment of the ROW Agreement but have not yet done so.  Indeed, the concept of interpreting the "successor and assigns" provision of a contract to confer third-party beneficiary status on one who does not yet qualify as a successor or assignee (but hopes to become one in the future) is so far-fetched that this Court cannot find a single case that advances this proposition—and FiberLight provides none.  Instead, it relies on cases that do not, in fact, hold that a potential assignee can be treated as having attained third-party beneficiary status for the purpose

of the prudential standing doctrine.  (*See* Pl.'s Opp'n at 40 (discussing *Don Rose Oil Co. v. Lindsley*, 206 Cal. Rptr. 670, 673–74 (Cal. Ct. App. 1984), a state law case in which the prudential standing doctrine was not at issue); *id.* at 40–41 (arguing that the court in *Sea Air Shuttle Corp. v. Virgin Islands Port Authority*, 800 F. Supp. 287 (D.V.I. 1992), held that "an actual assignment was not necessary," when the court in that case instead was addressing the plaintiff's right to invoke the rights of a party to an agreement and not whether plaintiff could sue in its own right as a third-party beneficiary of the contract).

It is also worth noting that, quite ironically, FiberLight is clearly attempting to have it both ways when it comes to being considered an assignee of the Row Agreement.  That is, FiberLight is willing to *accept* the mantle of assignee of the ROW Agreement for the purpose of third-party beneficiary right-to-sue status, but it has repeatedly and consistently *rejected* assignment of that same agreement in negotiations with Defendants, and in fact, the very basis for the lawsuit that FiberLight is seeking to advance is that the ROW Agreement in unacceptable and should be reformed (or at least that the fee payment provision should be rescinded), so that FiberLight can accept assignment of it.  FiberLight cannot reasonably proceed to sue as an assignee of a contract in order to press a claim that the contract's allegedly unfair payment provisions have prevented it from becoming an assignee.

This Court is also unmoved by FiberLight's contention that it can file suit to challenge the ROW Agreement as if standing in the shoes of party TWTC—*i.e.*, that FiberLight has third-party standing to invoke TWTC's right to seek reformation of the ROW Agreement—as a result of FiberLight's "vested interest" in the ROW Agreement. (Pl.'s Opp'n at 40 (citing *Playboy Enters.*, 906 F.2d at 37).)  While it is true that the

cases that FiberLight relies on for this proposition are all third-party standing cases in which courts have permitted plaintiffs to assert the rights of third parties in certain limited circumstances (*see* Pl. Mem. at 40–42), it is equally clear that FiberLight fails to meet the established criteria for demonstrating third-party standing.  Specifically, FiberLight does not necessarily "have a close relationship with the real party in interest," *U.S. House of Representatives*, 11 F. Supp. 2d at 88 (internal quotation marks omitted), and even if the bond that the Purchase Agreement formed between FiberLight and TWTC rises to the level of a close relationship for third-party standing purposes, FiberLight has failed utterly to demonstrate that there is any "barrier keeping [TWTC] from asserting its rights[,]" *id.* (internal quotation marks omitted).  Thus, FiberLight has not established third-party standing.  *See, e.g.*, *Goodman*, 182 F.3d at 992 (dismissing case for lack of third-party standing because plaintiff failed to identify any hindrance to the third parties' ability to assert their own interest); *Advantage Healthplan, Inc. v. Potter*, 391 B.R. 521, 548–49 (D.D.C. 2008), *aff'd sub nom.*, *Greater Se. Cmty. Hosp. Found., Inc. v. Potter*, 586 F.3d 1 (D.C. Cir. 2009) (dismissing case for lack of third-party standing where plaintiff did not have a close relationship to the parties in interest and those parties were not hindered in asserting their own rights).

    The long and short of all this is that FiberLight has failed to demonstrate that it has satisfied the prudential standing doctrine when it comes to bringing claims against Amtrak and TWTC that arise under the ROW Agreement.  FiberLight is neither a party to the ROW Agreement nor a third-party beneficiary of that agreement, and it cannot attack the ROW Agreement's terms on TWTC's behalf.  Consequently, this Court does not have jurisdiction to consider any of the claims in FiberLight's complaint that maintain that the ROW Agreement's fee payment provision is improper and request a

declaration to that effect—*i.e.*, Claims For Relief III through VII of the amended

complaint.[7]

### 2.  FiberLight Lacks Constitutional Standing To Challenge Amtrak's Right To Charge A Fee For Access To The Property

Having determined that FiberLight does not have prudential standing with

respect to the ROW Agreement-related allegations, there is no need to address whether

those same claims nevertheless satisfy the constitutional standing requirements.

However, to the extent that certain claims in FiberLight's complaint can be

characterized as going beyond the ROW Agreement to seek the more general

declaration "that Amtrak does not have a right to charge fees for access to the Union

Station Property" (*id.* ¶ 80), this Court must evaluate whether FiberLight has

constitutional standing to make such a claim (*see* Pl.'s Opp'n at 44 (arguing that the

challenge to Amtrak's ability to charge a fee "is not limited in scope to issues relating

to the ROW Agreement;[] it is broader in scope and asks for relief independent of that

Agreement")).  As explained above, constitutional standing requires an "injury in fact"

that is "actual or imminent, not conjectural or hypothetical" and that can be redressed

by an order of the Court.  *Lujan*, 504 U.S. at 560 (internal quotation marks and citation

omitted).  With respect to the requested declaration that Amtrak cannot charge a fee for

access to the Union Station property, FiberLight has failed to satisfy the constitutional

standing requirements for at least two reasons.

First, FiberLight has not shown that it has suffered, or imminently will suffer, an

injury-in-fact as a result of Amtrak's decision to charge fees for a right-of-way over the

---

[7] FiberLight suggests that "[e]ven if the court were to find that FiberLight lacked standing," this Court should "nonetheless determine whether Amtrak has a right to license its property."  (Pl.'s Opp'n at 41.) This Court emphatically rejects any such suggestion.  *See Animal Legal Def. Fund, Inc. v. Espy*, 29 F.3d 720, 723 (D.C. Cir. 1994) ("Standing, whether constitutional or prudential, is a jurisdictional issue which cannot be waived or conceded.").

Union Station property.  FiberLight has not secured a right-of-way from Amtrak, nor is it in privity with Amtrak in any other respect; therefore, FiberLight does not have a direct stake in a decision from this Court regarding Amtrak's ability to charge fees in exchange for a right-of-way.  Moreover, and perhaps even more important, the complaint does *not* allege that Amtrak is seeking any fees from FiberLight, so there is simply no factual basis upon which to conclude that FiberLight faces actual or imminent injury due to Amtrak's allegedly improper fee mandate.

To the extent that FiberLight is asserting that its injury-in-fact is not Amtrak's ability to charge a fee *per se*, but rather the uncertain effect that Amtrak's attempt to charge a fee has on the assignment negotiations (*see* Am. Compl.¶¶ 72, 74), that injury is neither actual nor imminent.  The negotiations between FiberLight, TWTC, and Amtrak regarding assignment of the ROW Agreement or any other contract for a right-of-way can proceed—or fail—for reasons that have nothing to do with any ruling from this Court regarding Amtrak's ability to charge fees.  Furthermore, FiberLight has not offered any support for its suggestion that its lack of certainty regarding the permissible terms of a possible future contract is an injury that entitles it to come to this Court and request a declaration of rights.  Federal courts consider *actual* cases and controversies that are brought to them by parties who have suffered, or imminently will suffer, cognizable injuries-in-fact.  *See Lujan*, 504 U.S. at 560.  They do not serve as arbiters of pre-contract negotiations, pinning down the legally acceptable provisions of potential agreements for parties that have concerns about the terms that are being offered.

Second, if the allegations of FiberLight's complaint are interpreted to assert that FiberLight has been, or will be, injured because TWTC is seeking reimbursement of the more than $500,000 of fees that TWTC paid to Amtrak on FiberLight's behalf (*see* Am.

Compl. ¶ 74; Pl.'s Opp'n at 45), this Court concludes that such an injury-in-fact still falls short of satisfying the constitutional standing requirements. This is because Article III demands that there "be a *causal connection* between the injury and the conduct complained of[,]" *Lujan*, 504 U.S. at 560 (emphasis added), and the requisite causation is not clear on the face of FiberLight's complaint. Indeed, rather than establishing a direct link between Amtrak's challenged right to charge an access fee and TWTC's demand for payment from FiberLight, the complaint alleges that TWTC has demanded reimbursement *under the Purchase Agreement* (Am. Compl. ¶ 69 (emphasis added)), which is based on the terms of the ROW Agreement (*id.* ¶ 41), which, in turn, stems from the challenged assumption that Amtrak has a legal right to charge an access fee (*id.* ¶ 37). Thus, the provisions of both the Purchase Agreement and the ROW Agreement stand between FiberLight's alleged injury (TWTC's demand for fees) and the conduct FiberLight seeks to challenge (Amtrak's right to charge a fee), and FiberLight is hard pressed to show that the requisite degree of causation exists here. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) ("The more attenuated or indirect the chain of causation between the [defendant's] conduct and the plaintiff's injury, the less likely the plaintiff will be able to establish a causal link sufficient for standing.").

For these reasons, this Court concludes that not only does FiberLight lack prudential standing to challenge the fee payment provisions of the ROW Agreement directly, it also lacks constitutional standing to launch an indirect attack on those provisions, by bringing a claim that seeks a general declaration that Amtrak does not have a legal right to charge an access fee. (*See* Am. Compl. ¶¶ 73, 75, 80.)

**B.  This Court Declines To Exercise Its Discretion To Declare FiberLight's
Rights As The Owner Of The Fiber Optic Cable Network Vis-à-vis
Amtrak and TWTC**

What is left of FiberLight's complaint after weeding out claims that relate either

to provisions of the ROW Agreement or to Amtrak's general right to charge fees for the

use of the Union Station property is FiberLight's request for a declaration that

addresses the current alleged "uncertainty" regarding "the relationship between

FiberLight, Amtrak, and TWTC in relation to the Union Station Property."  (Am.

Compl. ¶ 72.)  In this regard, FiberLight specifically seeks a declaration that FiberLight

"is not a trespasser on Amtrak's property" and thus that "Amtrak cannot deny

FiberLight direct access to the rights-of-way[,]" and also a declaration that "Amtrak

cannot take ownership" of FiberLight's cable.  (*Id.* at 33.)  As far as TWTC is

concerned, FiberLight requests a declaration that "FiberLight does not owe TWTC any

rights-of-way fees under the Asset Purchase Agreement[,]" and it asks this Court to

declare that "TWTC cannot obstruct FiberLight's direct access to the rights-of-way[,]"

or "force or require FiberLight to remove" its cable, or "convey ownership" of the cable

to Amtrak "at any time[.]"  (*Id.*)  In addition, FiberLight seeks a "holding that TWTC

has committed an anticipatory breach of the Asset Purchase Agreement" and an award

of "damages to be established at trial[.]"  (*Id.* at 34; *see also id*. ¶¶ 114–17.)

Assuming—without deciding—that FiberLight has standing to bring these remaining

claims, this Court nevertheless declines to exercise jurisdiction over these claims, both

in its discretion under the Declaratory Judgment Act (*see* Amtrak's Mem. at 37–38;

TWTC's Mem. at 37–42), and because, with respect to FiberLight's anticipatory breach

claim against TWTC, this Court would be going out of its way to exercise supplemental

jurisdiction over state law claims under circumstances in which state law governs and a

state court would be fully equipped to handle FiberLight's allegations.

32

1.  <u>The Factors Applicable To The Exercise Of Discretion Under The
Declaratory Judgment Act Weigh Against Addressing FiberLight's
Property Claims</u>

As noted above, whether or not to accede to a plaintiff's request for declaratory

relief under the Declaratory Judgment Act lies within the court's discretion.  *See*

*Wilton*, 515 U.S. at 286; *see also Pub. Affairs Press v. Rickover*, 369 U.S. 111, 112

(1962) ("The Declaratory Judgment Act was an authorization, not a command.").  The

court's discretion is not absolute, however, and it must be exercised wisely.  *See Pub.*

*Affairs Press,* 369 U.S. at 112 ("[A] District Court cannot decline to entertain such an

action as a matter of whim or personal disinclination.").  Thus, it appears that a valid

declaratory judgment claim should ordinarily be entertained, except if the

circumstances indicate that there is a reason for the court not to do so.  *See Wilton*, 515

U.S. at 288 ("In the declaratory judgment context, the normal principle that federal

courts should adjudicate claims within their jurisdiction yields to considerations of

practicality and wise judicial administration.").

Citing Wright and Miller's *Federal Practice and Procedure* treatise, the DC

Circuit long ago pointed to a series of factors that are among the "relevant"

considerations in deciding whether to withhold jurisdiction over a claim brought under

the Declaratory Judgment Act:

> whether [a declaration] would finally settle the controversy
> between the parties; whether other remedies are available or
> other proceedings pending; the convenience of the parties;
> the equity of the conduct of the declaratory judgment
> plaintiff; prevention of 'procedural fencing'; the state of the
> record; the degree of adverseness between the parties; and
> the public importance of the question to be decided.

*Hanes Corp. v. Millard*, 531 F.2d 585, 591 n.4 (D.C. Cir. 1976) (citing 10 Wright &

Miller, Federal Practice and Procedure § 2759 (1973)); *see also id.* at 592–93 (noting,

in addition, that "[t]he anticipation of defenses is not ordinarily a proper use of the

declaratory judgment procedure").[8]  To be sure, "[t]here are no dispositive factors."

*Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 95 (D.D.C. 2008).  But practical

considerations such as these permit a court to make a rational evaluation of whether

there is cause to refrain from exercising its authority to issue a declaratory judgment.

*See Morgan Drexen, Inc. v. CFPB*, 979 F. Supp. 2d 104, 116–19 (D.D.C. 2013)

(declining jurisdiction based on presence of some of the nine factors); *POM Wonderful*

*LLC v. FTC*, 894 F. Supp. 2d 40, 44–45 (D.D.C. 2012) (same); *Swish Mktg., Inc. v.*

*FTC*, 669 F. Supp. 2d 72, 76–80 (D.D.C. 2009) (same).

    In the instant case, the presence of five of the factors convinces this Court that it

should not proceed to consider FiberLight's residual requests for declaratory relief.

First and foremost, it is clear to the Court that a declaration of FiberLight's property

rights vis-à-vis Amtrak and TWTC is unlikely to settle the dispute between the parties.

As should be crystal clear by now, FiberLight's primary interest in bringing this case is

in having the fee payment provisions of the ROW Agreement nullified, or alternatively,

in having Amtrak's right to charge fees extinguished.  But as this Court has already

determined, FiberLight does not have standing to seek any fee-rescission remedy in the

context of this case.  This means that any ruling on FiberLight's residual property rights

claims—*e.g.*, its contentions that Amtrak cannot deny FiberLight access to the cable or

take ownership of it, and that TWTC cannot "obstruct FiberLight's direct access to the

rights-of-way for purposes of operating, maintaining and repairing" the cable (Am.

Comp. at 33)—is really beside the point.  Indeed, success on these claims might prevent

---

[8] Although it is common for district judges in this jurisdiction to view the listed considerations as factors that may justify *either* the court's affirmative exercise of jurisdiction over a declaratory judgment claim *or* its decision to decline to consider such claim, Wright, Miller (and now Kane) plainly refer to each factor as a potential basis for declining jurisdiction over a declaratory judgment action that is otherwise properly brought.  *See* 10B Wright, Miller & Kane § 2759.  Thus, the relevance of these factors appears to be the extent to which their presence or absence provides a basis for withholding jurisdiction when a declaratory judgment is being requested.

Amtrak from confiscating FiberLight's cable, or perhaps shield FiberLight from trespass charges, but that result is far less than what FiberLight seeks here.  (*See* Am. Compl. at 33–35 (only two of the 13 prayers for relief relate to the access or ownership issue).)  Thus, this Court has no doubt that a declaration regarding FiberLight's right of access as the owner of the fiber optic cable network vis-à-vis Amtrak would not settle the real dispute between those parties—*i.e.,* whether or not Amtrak can charge a fee for FiberLight's exercise of any such right.  Likewise, a declaration from this Court that TWTC cannot recover fees from FiberLight pursuant to the Purchase Agreement would not prevent TWTC from attempting to recover these fees from FiberLight under *other* theories.  (*See* TWTC's Reply to Pl.'s Opp'n, ECF No. 30, at 12; *see also id*. at 12 n.19 (suggesting that, if TWTC were to seek to recover fees from FiberLight, it would do so under a theory of unjust enrichment).)  Therefore, affording FiberLight the relief it requests with respect to TWTC would not fully resolve the dispute between these two parties either.

The second factor that weighs against the Court's exercise of jurisdiction is FiberLight's conduct.  In this case, each party blames another for the delay in assigning the ROW Agreement—an occurrence that would have eliminated nearly all of the jurisdictional roadblocks and likely also would have obviated any need for a declaratory judgment action.  (*See* Amtrak's Mem. at 37–38 (arguing FiberLight's injury is "self-inflicted"); TWTC's Mem. at 41–42 (blaming FiberLight for delay); FiberLight's Opp'n at 47–48 (blaming both Amtrak and TWTC for the failure to assign).)  This Court is free to consider the parties' conduct in the course of negotiations, *see, e.g., Comm. on Judiciary*, 558 F. Supp. 2d at 97, and even by FiberLight's own account, FiberLight has repeatedly refused to accept assignment of the ROW Agreement, or to enter into any

other easement contract with Amtrak, all while receiving the benefit of accessing and maintaining its cable network on TWTC's dime over an extended period of years. (*See, e.g.,* Am. Compl. ¶¶ 26–37.)  Moreover, it appears that FiberLight has brought this lawsuit in an attempt to strengthen its own negotiating position with respect to assignment of the ROW Agreement, and also out of an unabashed reluctance to commit to paying a fee in exchange for the benefit of an easement without a guarantee that such a fee payment requirement is valid.  (*See* Pl.'s Opp'n at 10 ("FiberLight cannot execute an assignment agreement assigning the ROW Agreement from TWTC to FiberLight without first confirming what billable interest, if any, Amtrak has in the property.").)  Although it might be a stretch to characterize FiberLight's conduct in filing the instant action as an abuse of process that rises to the level of inequitable conduct, FiberLight's obviously improper attempt to engage this Court in pre-contract negotiations that have reached a stalemate largely because of FiberLight's own fear of commitment under routine business circumstances weighs against this Court's exercise of jurisdiction.

The complaint's allegations also support Defendants' argument that FiberLight is engaging in some degree of "procedural fencing"—*i.e.*, that FiberLight is using the declaratory judgment device to preempt another lawsuit and to engage in forum-shopping.  *See Morgan Drexen*, 979 F. Supp. 2d at 118; *Swish Mktg.*, 669 F. Supp. 2d at 78; *see also Swish Mktg.*, 669 F. Supp. 2d at 78 (explaining that it is improper for a plaintiff to file suit under the Declaratory Judgment Act in advance of another impending suit to obtain a more favorable forum for the declaratory judgment plaintiff at the expense of the "natural plaintiff" (internal quotation marks and citation omitted)).  According to the complaint, FiberLight filed the instant action only after TWTC made repeated demands for repayment of the fees that TWTC had paid to Amtrak (*see* Am.

Compl. ¶¶ 41–42, 46, 48), and thus, FiberLight was certainly "aware of the likelihood of" litigation. *Morgan Drexen*, 979 F. Supp. 2d at 118; *see also Swish Mktg.*, 669 F. Supp. 2d at 78 (finding procedural fencing where the plaintiff filed suit "mere weeks before the agency's 'deadline' to settle the case"). What is more, by filing this declaratory judgment action, FiberLight not only was able to choose its favored forum, it also avoided the potential of being hauled into Court—perhaps in Delaware (*see* Purchase Agreement § 8.09 (forum selection clause requiring that any action involving the agreement be brought in federal or state court in Delaware))—and called to account for its actions in a lawsuit filed against it by TWTC. Accordingly, there does indeed appear to be an element of procedural fencing here (*see* TWTC's Mem. at 41–42), and this consideration, too, provides a reason for this Court to stay is hand. *See Swish Mktg.*, 669 F. Supp. 2d at 78–79.

The public importance factor also cuts against the exercise of declaratory judgment jurisdiction in this case. As Wright, Miller & Kane have observed, "courts particularly are reluctant to resolve important questions of public law in a declaratory action[.]" 10B Wright, Miller & Kane, Federal Practice and Procedure § 2759 (3d. ed. 1998); *see also Moore v. U.S. House of Representatives*, 733 F.2d 946, 956 (D.C. Cir. 1984) (declining to exercise jurisdiction over a case that raised important separation of powers concerns that were better resolved through the legislative process); *Flynt v. LFP, Inc.*, 245 F. Supp. 2d 94, 109–10 (D.D.C. 2003), *aff'd sub nom.*, *Flynt v. Rumsfeld*, 355 F.3d 697 (D.C. Cir. 2004) (declining to exercise jurisdiction over important but "premature" facial First Amendment challenge). FiberLight's "dedicated to public use" allegations—which undergird the trespass-related claims—raise such significant questions of law because they implicate Amtrak's ability to control the public's access

to the Union Station property generally.  (*See* Pl.'s Opp'n at 7–22 (asserting that the property at issue was dedicated to public use early in the 20th century, and thus Amtrak does not, in fact, own it and cannot charge fees for its use).

The final factor that indicates that this Court should decline jurisdiction is the fact that FiberLight appears to be seeking to establish an "anticipatory defense" against potential future claims brought by TWTC and Amtrak.  *Hanes Corp.*, 531 F.2d at 592–93.  This factor raises the same concerns as the procedural fencing consideration discussed above, and it leads to the same result.  FiberLight filed its lawsuit just five days before TWTC's ultimatum was due to expire (Am. Comp. ¶ 48), and less than a week after Amtrak demanded that FiberLight accept assignment of the ROW Agreement or remove its cable entirely (*id.* ¶ 49).  By launching the present declaratory judgment action, FiberLight ensured that it was able to choose the forum for the parties' disputes, and also, perhaps even more importantly, that FiberLight did not have to defend against *two different actions*, but instead, could preemptively respond to any trespass-related claim by Amtrak and any reimbursement-related claim by TWTC *together*, in the context of a single lawsuit.  All of this strongly suggests that FiberLight has moved deftly to invoke the Declaratory Judgment Act in the context of the instant case in order to engage in "a disorderly race to the courthouse," *Hanes Corp.*, 531 F.2d at 593, and for this reason, too, this Court should decline the invitation to declare a winner. *See BASF Corp. v. Symington*, 50 F.3d 555, 559 (8th Cir. 1995) ("It is our view that where a declaratory plaintiff raises chiefly an affirmative defense, and it appears that granting relief could effectively deny an allegedly injured party its otherwise legitimate choice of the forum and time for suit, no declaratory judgment should issue.").

In sum, this Court finds that a declaration regarding FiberLight's property claims would not settle the controversy between the parties; FiberLight can be considered to have acted somewhat inequitably; FiberLight has engaged in procedural fencing; the remaining claims raise issues of public importance that are better decided in the context of a fully-litigated case; and FiberLight is requesting what amounts to an anticipatory defense.  Consequently, this Court will not exercise jurisdiction over FiberLight's claims for declaratory relief.

**2.  The Exercise Of Supplemental Jurisdiction Over FiberLight's Anticipatory Breach Claim Against TWTC Is Not Warranted**

Finally, although FiberLight apparently seeks to have this Court exercise supplemental jurisdiction over its claim that TWTC has committed an anticipatory breach of the Purchase Agreement (*see* Am Compl. ¶¶110–117 (Eighth Claim For Relief)), this Court sees no good reason for doing so, and this is especially so given that all of FiberLight's claims against Amtrak—*i.e.*, all of the claims over which this Court has original jurisdiction—have already been dismissed.[9]  To be sure, federal courts are permitted to exercise supplemental (or "pendent") jurisdiction over state law claims that "form part of the same case or controversy" as federal claims over which they have original jurisdiction, 28 U.S.C. § 1367(a), but courts may also "decline" to exercise such jurisdiction in certain circumstances, *see id.* § 1367(c).  "In the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the

---

[9]  Amtrak is an unusual defendant because more than half of its stock is owned by the federal government (Am Compl. ¶ 5), thereby automatically implicating federal court jurisdiction, *see* 28 U.S.C. § 1349 (granting federal jurisdiction over corporations in which the United States is a majority shareholder).

remaining state-law claims." *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005) (internal quotation marks and citation omitted).

So it is here.  In accordance with the analysis above, this Court will not be proceeding to consider the merits of any of the claims in this case over which this Court has original jurisdiction (the claims against Amtrak).  Additionally, this case is still at an early stage procedurally, and it appears that a decision not to exercise jurisdiction over FiberLight's anticipatory breach claim against TWTC will not unfairly prejudice the parties.  *See ZilYen, Inc. v. Rubber Mfrs. Ass'n*, 935 F. Supp. 2d 211, 225 (D.D.C. 2013) (declining jurisdiction based on prior dismissal of federal law claims, the early stage of the case, and the lack of prejudice); *Jones v. D.C. Water & Sewer Auth.*, 922 F. Supp. 2d 37, 43 (D.D.C. 2013) (same); *Mead v. Lindlaw*, 839 F. Supp. 2d 66, 74 (D.D.C. 2012) (same).  Therefore, this Court will decline to exercise supplemental jurisdiction over FiberLight's remaining state law claim against TWTC.

## IV.     CONCLUSION

It may well be that, as FiberLight argues, "the real question to be resolved" in this dispute is whether Amtrak has the legal right to extract fees for a right-of-way over the Union Station property, as Amtrak purports to do in the ROW Agreement that it has executed with TWTC.  (Am. Compl. ¶ 55).  However, for the reasons stated above, non-party FiberLight does not have standing to litigate that issue in the context of this case, and given this fact, the Court sees no reason to exercise its discretion to resolve peripheral state-law property-rights claims that are better brought in other procedural postures and in other fora.  Thus, as explained above and as set forth in the separate order accompanying this memorandum opinion, the motions to dismiss that Amtrak and

TWTC have filed are **GRANTED**, and all of the claims that FiberLight has brought in this declaratory judgment action against Amtrak and TWTC are **DISMISSED**.

DATE:  March 2, 2015                    *Ketanji Brown Jackson*
                                        KETANJI BROWN JACKSON
                                        United States District Judge